**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**The MADISON COURIER, INC.,
Respondent.**

No. 24808.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1971.

Decided Aug. 9, 1972.

Mr. Stanley J. Brown, Atty., N. L. R. B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for petitioner.

Mr. Herbert C. Snyder, Jr., Indianapolis, Ind., for respondent.

Before LEVENTHAL, MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

On January 4, 1967, the National Labor Relations Board (N.L.R.B. or the Labor Board) issued a Decision and Order finding that The Madison Courier, Inc. (the Company or the Employer) had violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act, as amended (N.L.R.A.),[1] by improperly refusing to recognize and bargain with Local 10, International Typographical Union, AFL-CIO (the Union), as the exclusive bargaining representative of its employees; that the Company had further violated section 8(a)(1) of the Act by interfering with and coercing its employees in the exercise of their protected right of self-organization;[2] and that by reason of these unlawful acts, the Company had caused its employees to engage in an unfair labor practice strike.[3] The Labor Board issued a cease and desist order against further violations by the Company, and it directed the Employer, upon application, to reinstate a number of unfair labor practice strikers to their former or substantially equivalent positions and to make them whole for any loss of earnings resulting from its failure to so reinstate.[4] Thereafter, on December 26, 1967, we enforced the Labor Board's order in full.[5]

---

1. 29 U.S.C. §§ 158(a)(5) and 158(a)(1) (1970).

2. *See* section 7 of the N.L.R.A., 29 U.S.C. § 157 (1970), which provides:

 § 157. Right of employees as to organization, collective bargaining, etc.

 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

3. The Madison Courier, Inc., 162 NLRB 550 (1967).

4. Trial Examiner William Scharnikow's decision regarding the underlying unfair labor practice case, which was ultimately adopted by the N.L.R.B. on January 4, 1967, had been issued on July 7, 1966. *See* 162 NLRB 550. On July 22, 1966, the Company received a letter dated July 21, 1966, wherein all the claimants unconditionally applied for reinstatement. Since the Company failed to respond to this letter, the unfair labor practice strike continued until the Board and this court had denied the Company's unfair labor practice claim. It was not terminated until January of 1968, when, pursuant to our enforcement order (*see* note 5, *infra*), appropriate reinstatement offers were made. It was this recalcitrance on the part of the Employer to accept the claimants' application for reemployment which gave rise to the make-whole portion of the N.L.R.B.'s remedial order.

5. Louisville Typographical Union No. 10, International Typographical Union, AFL-CIO v. N.L.R.B., 57 L.C. ¶ 12,647, 67 LRRM 2462 (D.C.Cir.1967).

On November 12, 1968, the Acting Regional Director for Region 25 issued and served on the parties a back pay specification and notice of hearing, and the Company filed an answer thereto. The hearing was held before Trial Examiner Benjamin Blackburn for the purpose of determining the Employer's proper back pay obligation to the claimants.[6] Although the Company did not dispute the method of computation utilized by the Acting Regional Director or the general bounds of the back pay period, it did assert several affirmative defenses in mitigation of its alleged back pay liability. It contended: (1) that the claimants were not entitled to back pay due to their claimed failure to make reasonable efforts to obtain appropriate interim employment; (2) that Claimant August Mead was not entitled to back pay on the ground that his part-time position had been eliminated during the back pay period; and (3) that the back pay specification erroneously included amounts for Christmas bonuses and insurance coverage during the back pay period.

On May 26, 1969, the Trial Examiner issued his Supplemental Decision in which he rejected all of the Company's affirmative defenses and found that the claimants were entitled to back pay in certain specified amounts.[7] On January 16, 1970, the N.L.R.B. completely adopted the findings, conclusions, and recommendations of the Trial Examiner.[8] The Company's continued refusal to pay the back pay sums ordered by the Labor Board in its Supplemental Decision and Order has precipitated the instant enforcement proceeding before this court.

Two major issues are presented to this court.[9] The first one concerns

6. The thirteen claimants include David Ashby, Bernard Corbin, Albert Dowell, Walter Dowell, Paula Feltner, Louis Giltner, Rudolph Juett, Virginia Kerr, Henry Lorenz, Jr., August Mead, Judith Moore, James Nichols, and Micky Storie. *See* Part I of this opinion, *infra*, for discussion of the facts concerning the claimants.

7. *See* 180 NLRB 781 ff.

8. The Madison Courier, Inc., 180 NLRB 781 (1970).

9. We believe that the N.L.R.B. correctly determined that claimant August Mead, who regularly performed part-time work for the Employer before the unfair labor practice strike, is entitled to back pay, despite the fact that the Company employed no such part-time individual during the back pay period. It is well settled that where "the loss of work experienced by the discriminatees had an illegal genesis, the burden was on the [Employer] to prove what part, if any, of the continued loss of work was due to economic exigencies." N.L.R.B. v. Ellis & Watts Products, Inc., 344 F.2d 67, 69 (6th Cir. 1965). *See* N.L.R.B. v. Mastro Plastics Corp., 354 F.2d 170, 176–177 (2nd Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); N.L.R.B. v. Biscayne Television Corp., 337 F.2d 267, 268 (5th Cir. 1964); N.L.R.B. v. Izzi, 395 F.2d 241, 242–243 (1st Cir. 1968). Although the Company demonstrated that it did not employ any part-time employee during the back pay period, this fact is not conclusive. The record indicates that work was performed during that period which was substantially equivalent to Mead's pre-strike job. The Board determined that the Company failed to carry its burden of showing that Mead's part-time position was terminated during the back pay period for valid economic reasons. We are unable to conclude that this determination is not supported by substantial evidence on the record considered as a whole. *See* section 10(e) of the N.L.R.A., 29 U.S.C. § 160(e) (1970); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

It is clear that the Board's inclusion of lost Christmas bonuses as part of the back pay order was entirely proper. *See* N.L.R.B. v. United States Air Conditioning Corp., 336 F.2d 275, 277 (6th Cir. 1964); Moss Planing Mill Co., 110 NLRB 933, 935 (1954), enfd. as modified on other grounds, 256 F.2d 653 (4th Cir. 1958); Nabors v. N.L.R.B., 323 F.2d 686, 690 (5th Cir. 1963), cert. denied, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964); Wittock Supply Co., 171 NLRB No. 33, slip op. at 7–8, 68 LRRM 1043 (1968), enfd., 136 U.S.App.D.C. 106, 419 F.2d 688 (1969). It was similarly appropriate to include amounts compensating the strikers for money they had to expend on interim insurance coverage due to the Company's improper recalcitrance in making rein-

the Company's contention that the N.L. R.B. incorrectly interpreted and applied the mitigation doctrine. The second involves the allegation that the Board failed to explain adequately the reasons for its Supplemental Decision. We find against the Board on both issues and remand the case to it for further proceedings.

## I

### THE BASIC FACTS

On July 22, 1966, following the issuance of Trial Examiner Scharnikow's decision in the underlying unfair labor practice case ordering the Employer to reinstate the unfair labor practice strikers (*i. e.*, the claimants here) upon application, the Company received a letter, signed by all thirteen claimants, in which they unconditionally applied for reinstatement.[10] The *Madison Courier* did not respond to this request, and the strikers continued to picket the Employer's plant daily and to engage in other activities usually associated with a strike, such as soliciting the support of the public through the distribution of handbills and the support of the Company's advertisers through personal appeals.[11] These general activities continued until January of 1968, when, pursuant to our decree enforcing the N.L.

R.B.'s prior order, the Employer offered reinstatement to the claimants.

Throughout the entire strike period, the claimants received strike benefits from the Union which were roughly comparable to the weekly take-home pay they received from the Employer prior to the strike. To be eligible for strike benefits, the claimants had to be available for picket line and other strike-related duties,[12] and, under the Union's bylaws, they were required to accept available work.

Following the Company's refusal to reinstate the unfair labor practice strikers, the Union advised them to register for employment with the Indiana Employment Security Division in Madison. Accordingly, in August of 1966, all of the claimants, with the exception of David Ashby,[13] registered with the state employment service, and all of the registrants, except Louis Giltner, periodically renewed their applications as required. Each of the registering strikers indicated that he was seeking employment only in the printing trade. When the claimants originally registered, and on various other occasions when they appeared at the state employment agency office, the man in charge indicated that he was aware that the strikers were from the *Madison Courier,* and he told them that

---

statement offers. *See* N.L.R.B. v. Rice Lake Creamery Co., 124 U.S.App.D.C. 355, 359–360, 365 F.2d 888, 892–893 (1966) ; Dayton Coal and Iron Corp., 101 NLRB 672, 672–673 (1952), enfd., 208 F.2d 394 (6th Cir. 1953) ; Deena Artware, Inc., 112 NLRB 371, 375 (1955), enfd., 228 F.2d 871 (6th Cir. 1955). *See also* Mastro Plastics Corp., 136 NLRB 1342, 1360 (1962), enfd., 354 F.2d 170 (2nd Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966).

10. For a complete statement of the facts of this case, see Trial Examiner Blackburn's decision. The *Madison Courier, Inc.*, 180 NLRB 781 ff.

11. The activities engaged in by the claimants after July 22, 1966, were precisely the same as they had undertaken prior to that time. *See* 180 NLRB at 782.

12. No claimant was denied strike benefits due to a failure to satisfy this requirement. The usual stint on the picket line was two hours a day, Monday through Saturday.

13. The Company contended that August Mead also failed to register with the state employment agency, but the Trial Examiner credited testimony which indicated that Mead had in fact registered, and the Board affirmed this finding. From the record considered as a whole, we are unable to conclude that the Board's determination in this respect was erroneous. *See* Joy Silk Mills, Inc. v. N.L.R.B., 87 U.S.App.D.C. 360, 369, 185 F.2d 732, 741 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951) ; United Steelworkers v. N.L.R.B., 139 U.S.App. D.C. 146, 147, 430 F.2d 519, 520 (1970).

"[y]ou know there's no printing available within a hundred miles of here." [14]

Although the strikers' applications for work remained on file with the state employment agency throughout the entire 18-month back pay period, none received a printing job referral.[15] The reason for this scarcity of available printing work was simply the limited number of printing employers located in and around the rural Madison area.[16] The claimants also sought printing work through the Union, but it was only able to locate jobs for Walter and Albert Dowell,[17] and Virginia Kerr, and these were all in Louisville, Kentucky, over fifty miles away.

██ Some time between the beginning of the unfair labor practice strike, in April of 1965, and the beginning of the back pay period, in July of 1966, the Union obtained a position for Mrs. Kerr with the Dunne Press in Louisville. The job lasted for two weeks, and during that time Mrs. Kerr remained in Louisville from Monday through Friday, returning home to Madison only on the weekend. At one point during the back pay period, the Union informed her that a job was again available at Dunne Press for her, but Mrs. Kerr declined acceptance of the position because she did not want to have to be away from her family again. In view of our limited reviewing function with respect to determinations of this type, we are unable to conclude that the Labor Board erred in deciding that Mrs. Kerr's rejection of this position was reasonable in light of her personal circumstances. We do not believe that the fact of her previous employment during the strike with Dunne Press necessitated a different conclusion by the Board, for her experience at that time indicated to her the personal hardship involved with a job so distant from her home. See Florence Printing Co. v. N.L.R.B., 376 F.2d 216, 221 (4th Cir), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967). Similarly, it was entirely reasonable for the Board to find that the other strikers were not obligated to seek work in Louisville or other areas located over fifty miles from Madison, due to the excessive commute such jobs would have entailed. See Florence Printing Co. v. N.L.R.B., supra; Nickey Chevrolet Sales, Inc., 160 NLRB 1279 (1966). See also Oman Construction Co., Inc., 144 N.L.R.B. 1534 (1963), enfd., 338 F.2d 125 (6th Cir. 1964), cert. denied, 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684 (1965).[18]

14. The Trial Examiner and the Labor Board determined that Ashby had failed to register because he was informed of the employment agent's pessimism and concluded that registering would be a futile act.

15. Only Bernard Corbin and Louis Giltner received referrals of any kind, and in their case, the available jobs were at a distillery in Lawrenceburg, Indiana, about fifty miles from Madison. Neither applied because of the great commuting distance the work would have involved.

16. The Madison Courier was the only daily newspaper in the nearby vicinity. The closest other daily papers were in Louisville, Kentucky; Cincinnati, Ohio; and Indianapolis, Indiana—all fifty or more miles from Madison. In addition there were five area weekly publications within the immediate area: the Trimble Democrat and Banner, in Bradford, Kentucky, 10 miles away; the Gallatin County News, in Warsaw, Kentucky, 35 miles away; the North Vernon Plain Dealer and Sun, in North Vernon, Indiana, 20 miles away; the Carrolton Mirror, in Carrolton, Kentucky, 12 miles away; and the Versailles Republican, in Versailles, Indiana, 25 miles away. There were also several small print-shops in the Madison area.

17. The two Dowells were hired in October of 1966 by the Courier-Journal in Louisville, and they worked there full time until they were reinstated by the Company. They commuted daily a distance of about 100 miles. They did not engage in picketing during the period of their Louisville employment, nor did they receive any strike benefits.

18. The fact that the Dowells were willing to undertake the excessive commuting burden associated with a Louisville position does not negate the propriety of the Board's conclusion with respect to the other strikers.

■ Although the state employment agency and the Union were unable to locate jobs within a reasonable distance from Madison, several of the claimants were able to find work in the area. Walter Dowell applied for and obtained casual work at a Madison print shop, before he was hired by the Louisville paper. Virginia Kerr, Bernard Corbin, James Nichols, and Henry Lorenz each worked one day per week for the *Trimble Democrat and Banner* during part of the back pay period.[19] Following the termination of the *Trimble Democrat* arrangement, James Nichols accepted part-time work at the *Gallatin County News*, after he was *sought out by the editor* of the paper.[20] August Mead obtained occasional work during the back pay period at two Madison print shops. Finally, Louis Giltner located part-time work as a grocery clerk, and Micky Storie found part-time employment as a mechanic for a motorcycle dealer.[21]

Very few individual efforts to locate interim employment were undertaken by the strikers during the back pay period. Although Walter Dowell applied for, and obtained, work at a Madison print shop, he made no other applications for employment. Henry Lorenz unsuccessfully sought work with a small job shop, but he too made no other applications for work. August Mead only applied to two Madison print shops. Louis Giltner successfully applied for work as a part-time grocery clerk, and Micky Storie was able to locate part-time work as a mechanic, but they made no other applications for employment. David Ashby's only application for work was with the Jefferson Proving Grounds, where he unsuccessfully sought work as a civilian ordinance man. Finally, Bernard Corbin unsuccessfully applied for part-time grocery work. *None* of the other *six* claimants applied for work of any kind on their own, during the back pay period.

The Trial Examiner and the Board concluded that *all thirteen* claimants had made reasonable efforts to secure "suitable" interim employment, thereby satisfying their mitigation obligations. They therefore determined that the claimants were *all* eligible for reimbursement by the Employer for their losses over the entire 18 month back pay period. For the reasons set out herein, we hold that the N.L.R.B. has misapplied the established mitigation doctrine principles and has failed to explain adequately any circumstances peculiar to this case which might have justified such deviation from recognized precedents.

II

**A. THE REMEDIAL AUTHORITY OF THE LABOR BOARD**

■ The National Labor Relations Act confers broad remedial authority on the N.L.R.B. Section 10(c) of the Act [22] authorizes the Board, where it has determined that an unfair labor practice has been committed, to require the violator "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this [Act]." The courts

---

19. Mrs. Kerr initially learned of the *Trimble Democrat* opening when *the proprietor asked her* to work for him. Since the paper was non-union, she first asked her Union whether she could accept the job. It informed her that she should and suggested that she share the work with Corbin, Nichols, and Lorenz, which she did. After it became apparent that there was really only enough work to occupy three days per week, Lorenz voluntarily dropped out of the arrangement.

20. Nichols was the Union chapel (local) chairman, to whom the strikers were required to report daily. However, this fact did not negate his right to back pay, so long as it did not prevent him from making the requisite efforts to secure suitable interim employment. *See* Florence Printing Co., 158 NLRB 775, 791–792 (1966), enfd., 376 F.2d 216 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967).

21. The four other claimants—Rudolph Juett, Judith Moore, Paula Feltner, and David Ashby—performed no work during the back pay period.

22. 29 U.S.C. § 160(c) (1970).

have generally given a liberal interpretation to this grant of authority.

■ It is well recognized that the broad remedial power provided in section 10(c) is for the Labor Board to exercise, subject to only limited judicial review. *See* Phelps Dodge Corp. v. N. L.R.B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 262–263, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); N.L.R.B. v. Brown, 380 U.S. 278, 291 n. 5, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).

This does not mean that courts should abdicate their judicial functions by rubber stamping N.L.R.B. decisions[23] since

"'[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.' American Ship Building Co. v. [National] Labor [Relations] Board, [380 U.S. 300], at 318 [, 85 S.Ct. 955, at 957, 13 L.Ed.2d 855]."[24]

This general deference to the N.L.R.B.'s recognized remedial expertise is particularly acknowledged in cases involving the formulation of back pay orders.

In solving the problems which arise in back pay cases the Board is vested with a wide discretion in devising procedures and methods which will effectuate the purposes of the Act. * * * National Labor Relations Board v. Seven-Up Bottling Co., [344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953)]; Phelps Dodge Corp. v. National Labor Relations Board, [313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941)].[25]

■ The finding by the Labor Board of an unfair labor practice and a discriminatory discharge or an improper refusal to reinstate an unfair labor practice striker upon unconditional application for reemployment is presumptive proof that some back pay is owed by the violating employer. *See* N.L.R.B. v. Mastro Plastics Corp., 354 F.2d 170, 178 (2nd Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 263, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969). The purpose of requiring that the employer make the discriminatee whole in such a case has a two-fold objective. First, the back pay remedy reimburses the innocent employee for the actual losses which he has suffered as a direct result of the employer's improper conduct; second, the order furthers the public interest advanced by the deterrence of such illegal acts.[26] While the need for achievement of the private reimbursement objective is obvious, courts have generally placed greater stress on the less apparent goal of furthering public policy. *See, e. g.*, Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 263 (1969). *See also* N.L.R.B. v. Mooney Aircraft, Inc., 366 F.2d 809, 811

---

23. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 95 L. Ed. 456 (1951) (emphasis supplied). *See* N. L. R. B. v. Brown & Root, Inc., 311 F.2d 447, 451 (8th Cir. 1963).
 Pure questions of law are, of course, ultimately subject to the traditional review of the judiciary. *See* N. L. R. B. v. Waterman Steamship Corp., 309 U.S. 206, 208, 60 S.Ct. 493, 84 L.Ed. 704 (1940).

24. N. L. R. B. v. Brown, 380 U.S. 278, 292, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).

25. N. L. R. B. v. Brown & Root, Inc., 311 F.2d 447, 452 (8th Cir. 1963). *See* N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953); N. L. R. B. v. Robert Haws Co., 403 F.2d 979, 980 (6th Cir. 1968).

26. *See* N. L. R. B. v. Mastro Plastics Corp., 354 F.2d 170, 175 (2nd Cir. 1965), cert. denied, 384 U.S. 972, 86 S. Ct. 1862, 16 L.Ed.2d 682 (1966).

(5th Cir. 1966).[27] It was this great emphasis upon the vindication of public policy which led the Supreme Court, in 1941, to establish what has become known as the mitigation (or willful idleness) doctrine.

## B. THE MITIGATION DOCTRINE

■ The facts of this case compel us to discuss several features of this doctrine which are involved here. In Phelps Dodge Corp. v. N.L.R.B., 313 U. S. 177, 199–200, 61 S.Ct. 845, 855, 85 L. Ed. 1271 (1941), .the Supreme Court noted that in fashioning a proper back pay order, the N.L.R.B. "may give appropriate weight to a clearly unjustifiable refusal [by the discriminatee] to take desirable new employment." This meant that if the employee seeking reimbursement for losses sustained as a direct result of his employer's unfair labor practices had not accepted available suitable employment during the back pay period, the Labor Board could reduce the liability of the employer by the amount the discriminatee would have earned had he accepted the interim position. Although the *Phelps Dodge* Court recognized the appropriateness of its newly enunciated doctrine in light of the private rights vindication objective of the make-whole remedy,[28] the major focus of its analysis was upon the need to further public policy. The Court had "in mind not so much the minimization of damages as the healthy policy of promoting production and employment." 313 U.S. at 200, 61 S.Ct. at 855. It noted that in formulating back pay orders, the N.L.R.B. must heed "the importance of taking fair account, in a civilized legal system, of every socially desirable factor in the final judgment." 313 U.S. at 198, 61 S.Ct. at 854.[29] With the concerns of the *Phelps Dodge* Court in mind, subsequent N.L.R.B. and court decisions have expanded and explicated the mitigation doctrine.

■ "It [has been] accepted by the Board and reviewing courts that a discriminatee is not entitled to back pay to the extent that he fails to remain in the labor market, refuses to accept *substantially equivalent employment,* fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason." (emphasis supplied), N.L.R.B. v. Mastro Plastics Corp., 354 F.2d 170, 174 n.3 (2d Cir. 1965), cert. denied, 384 U.S. 972, 86 S. Ct. 1862, 16 L.Ed.2d 682 (1966).[30] It

27. In Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 543, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568 (1943), the Supreme Court stated :

The instant reimbursement order is not a redress for a private wrong. Like a back pay order it does restore to the employees in some measure what was taken from them because of the Company's unfair labor practices. In this, both of these types of monetary awards somewhat resemble compensation for private injury, but it must be constantly remembered that both are remedies created by statute—the one explicitly and the other implicitly in the concept of effectuation of the policies of the Act—which are designed to aid in achieving the elimination of industrial conflict. They vindicate public, not private rights.

28. "Since only *actual losses* should be made good, it seems fair that deductions should be made not only for actual earnings by the worker [during the back pay period] but also for losses which he willfully incurred." Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 198, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941) (emphasis supplied).

29. *See* N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953) ; Southern Silk Mills, Inc., 116 NLRB 769, 772 (1956), remanded on other grounds, 242 F.2d 697 (6th Cir. 1957), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957).

30. *See* Alaska Steamship Co., 114 NLRB 1264, 1265 (1955), aff'd., 245 F.2d 282 (9th Cir. 1957) ; Southern Silk Mills, Inc., 116 NLRB 769, 773 (1956), remanded, 242 F.2d 697 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L. Ed.2d 37 (1957) ; Florence Printing Co. v. N. L. R. B., 376 F.2d 216, 221, (4th Cir.), cert. denied, 389 U.S. 840, 88 S. Ct. 68, 19 L.Ed.2d 104 (1967) ; N. L. R. B. v. Brown & Root, Inc., 311 F.2d 447, 452 (8th Cir. 1963).

has also been generally recognized that the burden of establishing facts in mitigation of the back pay liability is upon the unfair labor practice violator, and *not* upon the General Counsel of the Board who represents the interests of the discriminatee.

■■■ Once the General Counsel has established the gross amount of back pay due the discriminatees in question, "the burden is upon the employer to establish facts which would negative the existence of liability to a given employee or which would mitigate that liability." N.L.R.B. v. Brown & Root, Inc., 311 F. 2d 447, 454 (8th Cir. 1963). *See* N.L.R.B. v. Ellis & Watts Products, Inc., 344 F.2d 67, 69 (6th Cir. 1965); N.L.R.B. v. Miami Coca-Cola Bottling Co., 360 F.2d 569, 575–576 (5th Cir. 1966); N.L.R.B. v. Mooney Aircraft, Inc., 366 F.2d 809, 812–813 (5th Cir. 1966); N.L.R.B. v. Interurban Gas Co., 354 F.2d 76, 77 (6th Cir. 1965).[31] "The finding of an unfair labor practice is presumptive proof that some back pay is owed." [32]

■■■ Where an employer with a back pay liability contends that the discriminatees in question did not all make the required effort to mitigate their damages, the willful idleness issue must "be determined with respect to *each employee* considering the record as a whole." N.L.R.B. v. Rice Lake Creamery Co., 124 U.S.App.D.C. 355, 361, 365 F.2d 888, 894 (1966) (emphasis supplied). The particular facts concerning *each separate individual* must be considered by the Board. *See* United States Air Conditioning Corp., 141 NLRB 1278, 1280 (1963), enfd., 336 F.2d 275 (6th Cir. 1964).[33] This individualized, rather than group, approach is dictated by the nature of the mitigation rule which is generally recognized today. The merit of an individualized approach in a judicial matter is self-evident.

■■■ "In order to be entitled to backpay, an employee must at least make 'reasonable efforts to find new employment which is *substantially equivalent to the position [which he was discriminatorily deprived of] and is suitable to a person of his background and experience.*'" N.L.R.B. v. Miami Coca-Cola Bottling Co., 360 F.2d 569, 575 (5th Cir. 1966) (emphasis supplied). *See* Southern Silk Mills, Inc., 116 NLRB 769, 773 (1956), remanded, 242 F.2d 697 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957). However, while the liable employer may attempt to demonstrate that a particular employee failed to make the requisite "reasonable efforts to mitigate [his] loss of income * * * [the employee is] held * * * only to reasonable exertions in this regard, not the highest standard of diligence." N.L.R.B. v. Arduini Mfg. Co., 394 F.2d 420, 422–423 (1st Cir. 1968).[34] "[T]he principle of mitigation of damages does not require success; it only requires an honest good faith effort * * *" N.L.R.B. v. Cashman Auto

---

31. *See also* N. L. R. B. v. Rice Lake Creamery Co., 124 U.S.App.D.C. 355, 359, 365 F.2d 888, 892 (1966); Florence Printing Co. v. N. L. R. B., 376 F.2d 216, 223 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967); N. L. R. B. v. Robert Haws Co., 403 F.2d 979, 981 (6th Cir. 1968).

32. N. L. R. B. v. Reynolds, 399 F.2d 668, 669 (6th Cir. 1968). *See* N. L. R. B. v. Arduini Mfg. Corp., 394 F.2d 420, 423 (1st Cir. 1968).

Although the General Counsel is required to present only the "gross amounts of back pay due," *see* N. L. R. B. v. Brown & Root, Inc., 311 F.2d 447, 454 (8th Cir. 1963), he usually goes further, pursuant to the N. L. R. B.'s Rules and Regulations, Series 8 (29 C.F.R.), Section 102.53, and includes in the back pay specification deductions from gross back pay of all those amounts in mitigation which he discovered through, for example, personal interviews and social security records.

33. *See also* Missouri Transit Co., Inc., 125 NLRB 1316, 1328, 1331 (1959).

34. *See* N. L. R. B. v. Miami Coca-Cola Bottling Co., 360 F.2d 569, 575 (5th Cir. 1966); Heinrich Motors, Inc. v. N. L. R. B., 403 F.2d 145, 148–149 (2nd Cir. 1968).

Co., 223 F.2d 832, 836 (1st Cir. 1955).[35] On the other hand, the employer is not under the severe burden of establishing that a particular discriminatee *would have* located suitable interim employment had he only made the required effort, before the back pay liability may properly be reduced. "[W]ith such diligence lacking, the circumstance of a scarcity of work and the possibility that none would have been found even with the use of diligence is irrelevant." American Bottling Co., 116 NLRB 1303, 1307 (1956).[36]

■ A discriminatee need not seek *or* accept employment which is "dangerous, distasteful or essentially different" from his regular job. *See* Florence Printing Co. v. N.L.R.B., 376 F.2d 216, 221 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967); Mooresville Cotton Mills v. N.L.R.B., 110 F.2d 179, 181 (4th Cir. 1940). Similarly, he is not necessarily obligated to accept employment which is located an unreasonable distance from his home. *See* American Bottling Co., 116 NLRB 1303, 1306 (1956); N.L.R.B. v. Mastro Plastics Corp., 354 F.2d 170, 179 (2nd Cir. 1965), cert. denied, 384 U.S. 972, 86 S. Ct. 1862, 16 L.Ed.2d 682 (1966); Nick-

ey Chevrolet Sales, Inc., 160 NLRB 1279, 1280 (1966); Oman Construction Co., Inc., 144 NLRB 1534, 1537–1538 (1963), enfd., 338 F.2d 125 (6th Cir. 1964), cert. denied, 381 U.S. 925, 85 S. Ct. 1561, 14 L.Ed.2d 684 (1965). *See also* AMB-A-Tip Cigar Co., 64 NLRB 1009, 1020 n.17 (1945).[37]

■ Although the N.L.R.B. at one time regarded registration with the United States Employment Service,[38] or with the appropriate state employment agency,[39] as being conclusive evidence that a reasonable search for interim employment has been made, it has since abandoned this rigid approach. In *Southern Silk*, the Labor Board enunciated the doctrine which is presently followed:

[I]n view of the fact that Government employment services are but one of several means which are normally used by unemployed persons in seeking new employment and their effectiveness in placing registrants varies widely with the type and supply of labor being sought, *we shall no longer give conclusive weight to registration with such agencies in determining the issue of reasonable search, but shall treat such registration as a factor to*

---

35. *See* N. L. R. B. v. Pugh & Barr, Inc., 231 F.2d 558, 559 (4th Cir. 1956); Mastro Plastics Corp., 136 NLRB 1342, 1359 (1962), enfd., 354 F.2d 170 (2nd Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966).

36. "We do not * * * [believe] that it must appear that [the discriminatee] could have procured such a job [*i. e.*, suitable interim employment] before he can be found to have incurred a willful loss by the failure to apply for it. It is incumbent on a claimant to seek a job for which he has extensive experience." Knickerbocker Plastic Co., 132 NLRB 1209, 1219 (1961).

37. The discriminatee is not "necessarily obliged to accept employment at a distance from his home * * * [I]t is for the Board to determine whether, under the evidence, the location is a factor which may be reasonably taken into account. * * * [W]hether an employee acted reasonably or not in accepting, re-

jecting, or seeking a particular employment, [is] a question of fact." Florence Printing Co. v. N. L. R. B., 376 F.2d 216, 221 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967).

While a claimant is not obliged, in the first instance, to seek work outside the general geographical area of his pre-discrimination employment, he may be found to have willfully incurred a loss if he voluntarily relinquishes an interim job outside the area, which he obtained during the back pay period. *See* Ozark Hardwood Co., 119 NLRB 1130, 1139 (1957), remanded on other grounds, 282 F.2d 1 (8th Cir. 1960).

38. *See* Ohio Public Service Co., 52 NLRB 725 (1943), enfd., 144 F.2d 252 (6th Cir. 1944), cert. denied, 324 U.S. 857, 65 S.Ct. 861, 89 L.Ed. 1415 (1945).

39. *See* Harvest Queen Mill and Elevator Co., 90 NLRB 320 (1950).

*be given greater or less weight depending upon all the circumstances in each case.* [Emphasis supplied.] [40]

The application of rigid rules regarding the effect of picketing or receiving union strike benefits during the back pay period on the determination of mitigation doctrine questions has similarly been eschewed. The fact that unfair labor practice strikers received strike benefits does not diminish their right to receive back pay, *providing* they otherwise made reasonable efforts to locate suitable interim employment.[41] Likewise, the fact that such persons engaged in picketing during the back pay period does not automatically negate their right to reimbursement by their employer. However, like the receipt of strike benefits, picket line activity does *not* relieve the discriminatees of the obligation of making reasonable efforts to obtain appropriate interim employment.[42]

One final point which is worthy of general consideration here concerns a possible corollary to the mitigation doctrine which two other circuit courts have attempted to establish. In N.L.R.B. v. *Southern Silk Mills, Inc.*,[43] the

Sixth Circuit indicated its belief "that the usual wage earner, reasonably conscious of the obligation to support himself and family by suitable employment, *after* inability over a *reasonable period of time* to obtain the kind of employment to which he is accustomed, *would consider other available, suitable employment at a somewhat lower rate of pay 'desirable new employment';*" within the meaning of the general mitigation doctrine.[44]

A second decision often cited for the proposition that discriminatees must "lower their sights" in mitigating losses is the Fourth Circuit's *Moss Planing* opinion.[45] However, despite the fact that these two opinions are frequently relied upon by employers who are seeking to mitigate back pay liabilities, careful consideration demonstrates that their implications are not really very broad. Both decisions expressly emphasized the fact that no discriminatee is required to ever accept anything but *"suitable"* interim employment. Therefore, it is obvious that there is no requirement that such a person seek employment which is not consonant with his particular skills, background, and ex-

40. Southern Silk Mills, Inc., 116 NLRB 769, 770 (1956), remanded on other grounds, 242 F.2d 697 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L. Ed.2d 37 (1957). *See* Missouri Transit Co., Inc., 125 NLRB 1316, 1325 (1959); Ozark Hardwood Co., 119 NLRB 1130, 1134 (1957), remanded on other grounds, 282 F.2d 1 (8th Cir. 1960); American Bottling Co., 116 NLRB 1303, 1307 (1956). *See also* N. L. R. B. v. Pugh & Barr, Inc., 207 F.2d 409, 410 (4th Cir. 1953).

41. *See* Florence Printing Co. v. N. L. R. B., 376 F.2d 216, 218–220 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967); N. L. R. B. v. Rice Lake Creamery Co., 124 U.S.App. D.C. 355, 360, 365 F.2d 888, 893 (1966); N. L. R. B. v. Brashear Freight Lines, Inc., 127 F.2d 198, 199–200 (8th Cir. 1942).

42. *See* Ozark Hardwood Co., 119 NLRB 1130, 1135 n. 18, 1136–1138 (1957), remanded on other grounds, 282 F.2d 1 (8th Cir. 1960); N. L. R. B. v. Rice Lake

Creamery Co., 124 U.S.App.D.C. 355, 360–361, 365 F.2d 888, 893–894 (1966).

43. 242 F.2d 697 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957).

44. 242 F.2d at 700 (emphasis supplied). The *Southern Silk* court concluded that "[t]he failure of [two discriminatees], under the conditions existing in the present case, to seek or take *other suitable, available employment,* although *at a lower rate of pay,* over a period of approximately *three years,* constitute[d] to some extent at least loss of earnings 'willfully incurred.'" 242 F.2d at 700 (emphasis supplied).

45. *See* N. L. R. B. v. Moss Planing Mill Co., 224 F.2d 702, 705–706 (4th Cir. 1955). It is important to note that the Fourth Circuit was careful to indicate that discriminatees only have to seek *"suitable"* interim employment in any event. *See* 224 F.2d at 706. *See also* N. L. R. B. v. Moss Planing Mill Co., 256 F.2d 653, 654 (4th Cir. 1958).

perience. It is similarly apparent that he is not obliged to seek work which involves conditions that are substantially more onerous than his previous position.

■ Although a discriminatee *may* be required by the Labor Board to "lower his sights" by seeking less remunerative work after he was unsuccessfully attempted for a reasonable period of time to locate interim employment comparable with his improperly denied position, several considerations indicate that the N.L.R.B. and courts must be careful when applying such a requirement. If the discriminatee accepts significantly lower-paying work too soon after the discrimination in question, he may be subject to a reduction in back pay on the ground that he willfully incurred a loss by accepting an "unsuitably" low-paying position. On the other hand, under the *Southern Silk* formulation, if he fails to "lower his sights" after the passage of a "reasonable period" of unsuccessful employment searching, he may be held to have forfeited his right to reimbursement on the ground that he failed to make the requisite effort to mitigate his losses. Under these circumstances, we believe that it would not be unreasonable for the N.L.R.B. to resolve doubts in this area in favor of the innocent discriminatee. "[T]he Board can hardly be said to be effectuating policies beyond the purposes of the Act by resolving the doubt against the party who violated the Act." Leeds & Northrup Co. v. N.L.R.B., 391 F.2d 874, 880 (3rd Cir. 1968).[46] Such a resolution, "which deprives an employer of advantages accruing from a particular method of subverting the Act, is a permissible method of effectuating the statutory policy." Virginia Electric & Power Co. v. N.L.R.B., 319 U.S. 533, 541, 63 S.Ct. 1214, 1219, 87 L.Ed. 1568 (1943). *See also* N.L.R.B. v. Seven-up Bottling Co., 344 U.S. 344, 347–348, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

## C. THE REQUIREMENT THAT THE N.L.R.B. ARTICULATE REASONS FOR DECISION

■ It is readily apparent that if reviewing courts are to be able to perform properly their statutory function under the N.L.R.A., Labor Board decisions must be required to specifically articulate the reasons for the administrative determinations made therein. The general rule is stated in Phelps Dodge Corp. v. N.L.R.B., *supra*:

The administrative process will best be vindicated by clarity in its exercise. Since Congress has defined the authority of the Board and the procedure by which it must be asserted and has charged the federal courts with the duty of reviewing the Board's orders (§ 10(e) and (f)), it will avoid needless litigation and make for effective and expeditious enforcement of the Board's order to require the Board to disclose the basis of its order. We do not intend to enter the province that belongs to the Board .* * * All we ask of the Board is to give clear indication that it has exercised the discretion with which Congress has empowered it.[47]

There is a presumption that favors the Board, with its expertise, in its selection of remedies. * * * That presumption is given full effect when the Board makes a *conscious selection of remedies* to effectuate the Act, *provided reasons for its conclusion are stated or may fairly be discerned.*[48]

46. *See* N. L. R. B. v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 263–265, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); Booster Lodge No. 405, International Association of Machinists and Aerospace Workers, AFL–CIO v. N. L. R. B., 148 U.S.App. D.C. 119, 132, 459 F.2d 1143, 1155 n. 24, 29 (1972); N. L. R. B. v. Miami Coca-Cola Bottling Co., 360 F.2d 569, 572–573 (5th Cir. 1966).

47. Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 197, 61 S.Ct. 845, 85 L. Ed. 1271 (1941). *See* N. L. R. B. v. General Stencils, Inc., 438 F.2d 894, 905 (2nd Cir. 1971); N. L. R. B. v. Rice Lake Creamery Co., 124 U.S.App.D.C. 355, 364, 365 F.2d 888, 897 (1966).

48. International Union of Electrical, Radio & Machine Workers, AFL–CIO v. N. L.

## III

## THE BASIS OF THE N.L.R.B. DECISION

 The N.L.R.B. decision appears to have viewed the issue as whether the claimants had to choose between continued concerted activity and back pay.[49] We believe, however, that such a formulation distorted the real question. There is no doubt that the claimants had the protected right to continue to engage in their concerted action against the Employer after he improperly refused to reinstate them, and the mere fact that they continued to do so did not *per se* negate their right to receive back pay.[50] Nevertheless, such activity did *not* relieve the claimants from their well established obligation to take reasonable steps to secure work and thereby to mitigate the Company's back pay liability.[51]

 The N.L.R.B.'s strong desire to protect the strikers' right to continue their concerted activity caused it to egregiously misapply the established mitigation doctrine principles. It insisted upon considering the claimants as a single group, rather than examining their respective efforts to locate interim employment on an individualized basis. The Trial Examiner's Supplemental Decision, which the Labor Board adopted as the "basis" for its back pay order, stated:

> [We] find, therefore, that *all* of the claimants must be judged *together* in determining whether the jobs available in the Madison area were suitable to the background and experience of printers and *all must stand or fall together* in deciding the willful loss of earnings issued [sic].[52]

Such a disposition clearly violated the recognized principle of *treating each particular claimant separately* in determining his right to back pay,[53] and it may well have led the Board to erro-

R. B., 138 U.S.App.D.C. 249, 256, 426 F.2d 1243, 1250, cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970) (emphasis supplied). *See also* Melody Music, Inc. v. F. C. C., 120 U.S.App. D.C. 241, 244, 345 F.2d 730, 733 (1965).

49. *See* 180 NLRB at 788. Elsewhere in its opinion, the N. L. R. B. stated what it believed to be the relevant issue as "whether the claimants had to abandon their strike activities after applying for reinstatement and being ignored by [the Company] as the price of being entitled thereafter to backpay." 180 NLRB at 787.

50. *See* N. L. R. B. v. Rice Lake Creamery Co., 124 U.S.App.D.C. 355, 360–361, 365 F.2d 888, 893–894 (1966). *See also* Florence Printing Co. v. N. L. R. B., 376 F.2d 216 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed. 104 (1967).

51. *See* Ozark Hardwood Co., 119 NLRB 1130, 1135 n. 18, 1136–1138 (1957), remanded on other grounds, 282 F.2d 1 (8th Cir. 1960) ; cases cited note 50, *supra. Cf.* Southwestern Pipe, Inc., 179 NLRB 364 (1969), remanded on other grounds, 444 F.2d 340 (5th Cir. 1971). It is therefore apparent that Bernard Corbin's refusal to accept an available

full-time job in a grocery store due to the fact that it would have conflicted with his picketing duties would necessarily cause, contrary to the Labor Board's finding, an appropriate reduction in the amount of back pay owed to him, *unless* the N. L. R. B. properly determines upon remand that such employment was not "suitable" within the recognized meaning of the mitigation doctrine.

The fact that the claimants received lucrative strike benefits during the back pay period, thus relieving them of the economic hardships so frequently indigenous to strike activity, did not negative their right to back pay, *providing* they otherwise satisfied the mitigation doctrine requirements. *See* Florence Printing Co. v. N. L. R. B., 376 F.2d 216 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967). *See also* cases cited note 41, *supra.*

52. 180 NLRB at 787 (emphasis supplied). *See* 180 NLRB at 788–789.

53. *See* note 33, *supra,* and preceding text. The fact that such an individualized approach may cause some administrative difficulty does not, in our view, relieve the Board of its obligation to apply the established principle. *See* Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 198, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

neously conclude that the claimants only had the duty of seeking other comparable *printing industry* employment.

When a discriminatee has been improperly deprived of his employment position, he is under the recognized duty to make reasonable efforts to locate interim work comparable to his denied position *and* commensurate with his particular background and experience.[54] Although all of the claimants enjoyed printing industry skills, some of them also had other relevant experience which the N.L.R.B. failed to properly consider. Walter Dowell had previously spent fifteen years in the shipping department of a nail factory. James Nichols had earlier been employed for 18 months as a civilian gunner at the Jefferson Proving Grounds, following a two-year tour of military service. Louis Giltner had held prior jobs in farming and in a poultry processing plant, while Micky Storie had past experience as an automobile mechanic. David Ashby had also had experience in the automobile field, both as a body repairman and as a salesman, in addition to prior work as a farmer. Both Judith Moore, who had attended business school for one year and had previously worked for several weeks for a business office as a clerical employee, and Paula Feltner, who had gone to work for the Employer directly from high school, had initially performed office work for the *Madison Courier*, and as teletypesetter tape punch operators, they were used to working on typewriter-like keyboards. Despite the varied backgrounds and experiences of these particular claimants, the N.L.R.B. failed to consider whether they made adequate efforts to locate comparable *non-printing* work commensurate with their respective employment histories.

The record clearly established that non-printing jobs were available in the Madison area at Dow Corning Corporation, Olin Mathieson Chemical Corporation, Reliance Electric Company, Jefferson Proving Grounds, Indiana-Kentucky Electric Corporation, American Can Company, Grote Manufacturing Company, Rex Chain Belt Company, and Williamson Company.[55] The Trial Examiner concluded—and the Board wholly adopted his findings—that these jobs "were comparable to, but not identical with, the jobs held by the claimants at the Madison Courier prior to the strike with respect to wages, hours, and other conditions of employment, as well as the amount of physical effort required to perform them and the degree of personal satisfaction and status in the community they afforded to their holders."[56] He further concluded that "[e]ach of the claimants might have been hired to fill one or more of these jobs if they had elected actively to seek work outside the printing trade rather than to continue picketing and engaging in other strike-related activities during the backpay period * * *"[57] However, despite this last finding, the N.L.R.B. dismissed the failure of the claimants to seek such available non-printing positions as may have been commensurate with particular claimants' background and experience, by deciding that the *entire group* only had to seek printing industry positions. This clear error must be rectified on remand, by the thorough consideration of whether *particular* claimants should be denied back pay due to their failure to seek such available non-printing jobs.

We additionally believe that further consideration of this case by the Labor Board is required because of the inadequate and partially inconsistent explanation of the N.L.R.B.'s reasons for concluding that sufficient efforts had been made by the strikers to locate even printing industry work in the Madison

54. *See* N. L. R. B. v. Miami Coca-Cola Bottling Co., 360 F.2d 569, 575 (5th Cir. 1966); Southern Silk Mills, Inc., 116 NLRB 769, 773 (1956), remanded, 242 F.2d 697 (6th Cir.), cert. denied, 355 U. S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957).

55. *See* 180 NLRB at 785–786.

56. 180 NLRB at 786.

57. *Id. See* 180 NLRB at 787.

area. Most of the claimants' efforts to find interim printing employment were limited to registration with the state employment service and the making of inquiries through the Union. The majority made no individual applications with area printing establishments. The Board excused these seemingly inadequate efforts by concluding that the strikers "sought work in the printing trade in the Madison area in the only meaningful way open to them by registering for work with the Indiana Employment Security Division."[58] On the other hand, it excused David Ashby's failure to make such registration by concluding that it "would have been a futile act," due to the fact that no printing jobs were available through the employment bureau.[59] Thus for the former group, the Board justified its decision on the ground that what proved to be a "futile act," and which was therefore not required of Ashby, constituted a reasonable mitigation effort. We cannot subscribe to this logic.

In addition, registration with the appropriate state employment agency is no longer considered to be conclusive evidence of a reasonable effort to locate "suitable" interim employment.[60] It is merely one of several factors which must be considered in light of the particular circumstances of each case. Therefore, a reconsideration of this question must be undertaken by the N.L.R.B. on remand, with it giving appropriate respect to the mitigation principles set out in this opinion.

We similarly do not believe that the Board adequately explained the failure of the claimants to seek positions with the five area weekly papers. It concluded that this fact was "immaterial because none of them [the papers] sought an experienced printer during the backpay period even though they knew that the claimants were out of work."[61] However, "with such diligence lacking, the circumstance of a scarcity of work and the possibility that none would have been found even with the use of such diligence is irrelevant." American Bottling Co., 116 NLRB 1303, 1307 (1956). If upon remand the Board, while applying the proper standards, concludes that registration with the state employment agency and utilization of the Union "grapevine" were not sufficient by themselves to constitute reasonable efforts to locate appropriate interim employment, then it would appear that it would have to conclude that inadequate efforts were made by at least those employees who made no individual efforts to locate other work. We do not believe that the Board may properly excuse the failure of the claimants to seek interim employment on the ground that such efforts would have interfered with the retraining efforts they undertook, under the Union's supervision, during the strike. Although the Employer had converted its operations from a "hot-type letter press" system to a "cold-type offset press" operation shortly after the unfair labor practice strike began, all of the claimants were adequately protected by the prior Board order in this case, which we enforced, which required the Company to provide those not reinstated to their exact prior positions with adequate on-the-job retraining.[62]

---

58. 180 NLRB at 789.

59. 180 NLRB at 787. A similar inconsistency appears with respect to the N. L. R. B.'s excusal of Louis Giltner's failure to regularly renew his employment agency registration.

60. See American Bottling Co., 116 NLRB 1303, 1306–1307 (1956) ; Missouri Transit Co., 125 NLRB 1316, 1325 (1959). See also cases cited note 28, supra. Regarding Giltner's failure to renew his reg-

istration, see Burnup and Sims, Inc., 157 NLRB 366, 373–374 (1966), enfd., 383 F.2d 987 (5th Cir. 1967).

61. 180 NLRB at 789.

62. See The Madison Courier, Inc., 162 NLRB 550, 602 (1967). In its Supplemental Decision, the N. L. R. B. acknowledged the fact that the Employer had provided the required retraining. See 180 NLRB at 793.

■ The Labor Board should, of course, consider more fully on remand the arguments of the Employer concerning the so-called "lower sights" corollary to the mitigation doctrine which we discussed in Part I(B) of this opinion, *supra*. In its disposition below, the N.L.R.B. disposed of this issue in a most curious fashion:

This case presents no *Southern Silk* or *Moss Planing* issue of lowering of sights after being out of work for a long time with no money coming in. Thanks to the Union's strike benefits, the claimants had enough money coming in that they could afford to elect to continue to fight following [the Company's] decision to continue the war unabated. This case simply presents the issue of who should bear the cost of the claimants' decision to continue to exercise their rights following [the Employer's] decision to continue to resist their rights as unfair labor practice strikers.[63]

Since strike benefits are not considered to be equatable with mitigation earnings, which the *Southern Silk* and *Moss Planing* courts were concerned with, it is apparent that the Board's rationale is a *non sequitur*. The only way the N.L.R.B.'s reasoning could be interpreted in a rational manner, would be to conclude that strike benefits, like interim earnings, are deductible from an employer's back pay liability, and the Board has clearly, and we believe correctly, refused to ever render such a decision.[64] We therefore believe that further analysis of the "lower sights" issue should be undertaken by the Labor Board upon remand.

■ One final point which the N.L.R.B. has raised is deserving of mention. The Supreme Court has recognized the propriety of the Board's endeavoring to achieve more than one remedial objective when formulating a particular order:

It will not be denied that the Board may be mindful of the practical interplay of two remedies, back pay and reinstatement, both within the scope of its authority. Surely it may so fashion one remedy that it complements, rather than conflicts with, another. It is the business of the Board to give coordinated effect· to the policies of the Act.[65]

Nothing we say in this opinion should be interpreted as depriving the Board of this discretionary authority. We merely request it to provide adequate reasons for its choice of remedies and sufficient explanation for departures from past practices.[66]

■ As we discussed earlier in this opinion,[67] the N.L.R.B.'s broad remedial authority is subject to only "limited judicial review." This high degree of deference is due to the pervasive labor expertise which Congress anticipated when it established the Labor Board in 1935. However, in order to prevent a total abdication of the judicial function, reviewing courts must be careful to require that the agency's decisions be sufficiently specific to permit the rational analysis of their underlying reasoning. We do not believe that this basic requirement has been satisfied here.

The Labor Board's decision below failed to sufficiently explain why the claimants' election to continue their labor dispute with the Employer rather

63. 180 NLRB at 788.

64. *See, e. g.*, Southern Silk Mills, Inc., 116 NLRB 769 (1956), remanded on other grounds, 242 F.2d 697 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957).

65. N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 348, 73 S.Ct. 287, 97 L.Ed. 377 (1953). *See* Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 193, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

66. *See* N. L. R. B. v. General Stencils, Inc., 438 F.2d 894, 905 (2nd Cir. 1971): While the Board has wide discretion in framing remedies, the agency has a correlative duty to explain its imposition of a remedy in one case and its failure to do so in a seemingly similar —or even stronger—one on a basis reviewing courts can understand.

67. *See* Part II(A), *supra*.

than actively seek the "suitable" jobs which might have been available in the Madison area did not constitute a willful loss of earnings, in light of seemingly contrary reasoning in such cases as *Ozark Hardwood* [68] and *Southwestern Pipe*.[69] The Board also failed to explain adequately, in terms of the policies of the N.L.R.A., the apparently arbitrary group-classification of all jobs outside the printing trade as "unsuitable" interim employment for *all* of the claimants, in light of contrary holdings in such cases as *Knickerbocker Plastic, Southern Silk*, and *Moss Planing*.[70] Finally, we believe that the Labor Board failed to appropriately justify its findings that the claimants who made no attempt to obtain interim employment during the back pay period other than registering with the Indiana Employment Security Division and seeking job information through the Union, did not incur willful losses of earnings in light of apparently contrary holdings in *Arduini Manufacturing, Rice Lake Creamery, Pugh & Barr, Missouri Transit, Ozark Hardwood*, and *American Bottling*.[71] To paraphrase our decision in Melody Music, Inc. v. F.C.C.:

> Moreover, "the [Labor Board] has not explained its decision 'with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. * * * We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'" Secretary of Agriculture v. United States, 347 U.S. 645, 654 [, 74 S.Ct. 826, 98 L.Ed. 1015] (1954). We therefore remand this case for further proceedings. * * * Whatever action the [Board] takes on remand, it must explain its reasons and do more than enumerate factual differences, if any, between [this case] and the other cases; it must explain the relevance of those differences to the purposes of the [National Labor Relations Act].[72]

The case is remanded to the National Labor Relations Board for further proceedings in conformity with this opinion.

Judgment accordingly.

LEVENTHAL, Circuit Judge (concurring):

I concur in the judgment of the court insofar as it affirms the judgment of the Board. I also concur in the judgment of remand and the *ratio decidendi*, that in certain particulars there is an objectionable lack of clarity in the Board's reasoning, or in the Board's reconciliation of the present opinion with other Board jurisprudence. While the Board is free to reshape previous doctrinal expressions, the rule of law is best preserved if that is done expressly rather than by implication.

While I agree with much of Judge MacKinnon's opinion as written, and commend the underlying research and reflection, I write this separate opinion because certain expressions in the court's opinion, though not presented as

68. Ozark Hardwood Co., 119 NLRB 1130 (1957), remanded 282 F.2d 1 (8th Cir. 1960).

69. Southwestern Pipe, Inc., 179 NLRB 364 (1969), remanded on other grounds, 444 F.2d 340 (5th Cir. 1971).

70. Knickerbocker Plastic Co., 132 NLRB 1209 (1961); N. L. R. B. v. Southern Silk Mills, Inc., 242 F.2d 697 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957); N. L. R. B. v. Moss Planing Mill Co., 224 F.2d 702 (4th Cir. 1955).

71. N. L. R. B. v. Arduini Mfg. Corp., 394 F.2d 420 (1st Cir. 1968); N. L. R. B. v. Rice Lake Creamery Co., 124 U.S.App. D.C. 355, 365 F.2d 888 (1966); N. L. R. B. v. Pugh & Barr, Inc., 207 F.2d 409 (4th Cir. 1953); Missouri Transit Co., 125 NLRB 1316 (1959); Ozark Hardwood Co., 119 NLRB 1130 (1957), remanded, 282 F.2d 1 (8th Cir. 1960); American Bottling Co., 116 NLRB 1303 (1956).

72. Melody Music, Inc. v. F. C. C., 120 U.S.App.D.C. 241, 244, 345 F.2d 730, 733 (1965). *See* N. L. R. B. v. Rice Lake Creamery Co., 124 U.S.App.D.C. 355, 364, 365 F.2d 888, 897 (1966).

mandates that compel Board action or limit Board discretion, may be misapprehended as limiting the latitude available to the Board on remand.

Perhaps the most important relates to the implementation of the loss of earning rule. Under that rule an employee's recovery must be reduced by "any other earnings which he has obtained or willfully refused to obtain."[1]

As the court opinion notes, at least some employees who were awarded backpay could have taken other jobs that are comparable to those held prior to the strike in terms of wages, hours, and conditions of employment. The Board found that the jobs broadly available to the employees who were terminated through unfair labor practices, while comparable in such items as wages and hours, required a change in calling, that this calls for significantly greater sacrifice on the part of the printer, in a skilled craft, than an ordinary factory employee required to change his line of work.[2] The difficulty with the Board's opinion is that it lumped together persons who really had acquired a skilled craft, and young women recently out of school whose skills were limited to reading proofs and operating the typewriter-like keyboard of a teletypesetter tape puncher. In the absence of clearer findings than those before us to support a grouping of cases, the court's opinion rightly points out that the failure to treat separate matters separately may lead to confusion and error.

Where an employee is engaged in a skilled craft, the Board, concerned with appropriate remedy against an employer who illegally terminates that employment may certainly take into account diversion from craft skills and continuity, in determining whether or not a comparable opportunity was available elsewhere.

Even at common law an employer cannot argue that a wrongfully discharged employee with special skills is required to reduce damages by seeking earnings available in another line of work—even though income and hours could have been preserved—of a substantially different nature, especially if there is any possibility of prejudice in maintaining the skilled calling; and the question of suitability is a question of fact for the jury.[3]

Apart from the liability of an employer committing only a breach of a private contract, a company whose public wrong has interfered with a fundamental, statutory right of a skilled employee does not have the right to demand, in effect, that the employee move to another line of work, and abandon his skill for some not inconsiderable period. This is a matter for the Board to determine, taking into account the nature of the skill and the difference in the other work available. The Board is not only entitled to the same weight, as the trier of fact, as a jury acting under the instructions of the court, but to some latitude in determining the proper doctrine, that is, in determining to what extent transfer of the common law doctrine of mitigation of damages is in consonance with and furtherance of the purposes and objectives of the Act. Section 10(c) provides a "broad command," NLRB v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 262, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969), in its direction to the Board "to

---

1. See, e. g., Florence Printing Co. v. NLRB, 376 F.2d 216, 219 (4th Cir. 1967).

2. In the Trial Examiner's words:
 The printer, on the other hand, like any skilled worker in one of the recognized crafts, makes a sacrifice of no mean proportion when he gives up his trade and goes into an entirely different line of work.
 (p. 811).

3. Am.Jur.2d Damages, §§ 30, 71; Annot., Discharge-Minimizing · Damages-Employment, 28 A.L.R. 736 (1923); updated by Annot., 141 A.L.R. 662, 664 (1942). These annotations present a large number of supporting cases. See, e. g., American Trading Co. v. Steele, 274 F. 774 (9th Cir. 1921); Taylor v. Pope, 259 S.W. 527 (Mo.App.1924); Russellville Special School District v. Tinsley, · 156 Ark. 283, 245 S.W. 831 (1922).

take such affirmative action" as will effectuate the policies of the Act. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953). While the Board must take into account whether the remedies present an undue burden on employers, and cannot rest on an impermissible legal premise, it must in general be given wide latitude in the designation of remedies enforced against those violating the Act's provisions.

This latitude is not undercut by Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), and the Supreme Court's reference there to the policy of avoiding economic waste as an element in the doctrine requiring an employee to seek reasonably available alternative work. That consideration is not an absolute. Conceptually there is economic waste when a highly skilled employee fails to take a porter's job for which openings are available. But the arithmetical economic loss to society is more than counter-balanced by the human damage wrought if an employer engaged in illegal action can compel the person wronged to shatter his well-being. As the Court's opinion makes clear, "lower one's sights" is a vivid metaphor, but not a concept that controls all cases. That drastic choice may confront a person caught up in a tide of unemployment after statutory benefits run out—whether the unemployment is ascribable to change in technology, shifts in demand for goods and service, broader changes in economic conditions, or conceivably even changes in the wake of loss of an economic strike (without unfair labor practices). To avoid a drastic curtailment of income he may even have to pull up stakes and move to another region of the country, where there is a market for his skills. These drastic actions cannot, however, be compelled of him by an employer found to have acted illegally.

As to the registration with the state employment office, while this is not conclusive it is certainly some evidence of good faith and diligence of the employee in looking for other work. This is, as the court's opinion sets forth, an area where the burden is on the employer to present the affirmative defense of failure to make a reasonable search of interim work.[4] Even in a case where the facts are such, generating cause to question diligence, that a finding of diligence cannot be sustained when it is based solely on registration evidence, the evidence of registration may be taken into account, although it was completely ineffective in yielding employment opportunities, when accompanied by a showing of general labor conditions in the area.[5]

The difficulty with the findings before us is the Examiner's reference to the registration by the employees as a "charade." While Board counsel at oral argument sought to retrieve the situa-

4. NLRB v. Miami Coca-Cola Bottling Company, 360 F.2d 569, 575 (5th Cir. 1966): "It is not practical, and it would significantly hamper the backpay remedy, if each discriminatee were required to prove the propriety of his efforts during the entire backpay period. . . . We prefer the traditional allocation, consistently approved by the courts, of assigning to the general counsel the burden of proving damages, and to the employer the burden of proving facts to mitigate the extent of those damages." [Citations omitted.]

5. Thus in NLRB v. Pugh & Barr, Inc., 207 F.2d 409 (4th Cir. 1953), the court reversed a large award of some $7,000, as to which the Board had provided a credit of only $294 for two years earnings for "an ordinary skilled laborer." It felt this small amount an incredible indication with what could have been earned with reasonable diligence and concluded that the Board had wrongfully given conclusive effect to the registration with the state employment office. But following remand the court enforced the Board's re-entry of its order when it was brought out that West Virginia is "generally a labor surplus area" with his unemployment during the period involved, so that the slight earnings was not due to lack of effort but to basic general conditions. NLRB v. Pugh & Barr, 231 F.2d 558 (4th Cir. 1956).

tion by saying that the charade comment referred not to the original registration but to a later period in time, that is not clear in the findings, and a court should not be compelled to guess on matters like these.

Finally, while the general area of the law under discussion requires some consideration of the individual situations involved, it is appropriate to inject the caution that the Board is not disabled from making some group judgments as to persons in a class, where the class is not overbroad. This calls for discretion and judgment on the part of the Board as it does on the part of courts considering class actions. I join the court's call for greater individualization of consideration than the Board accorded, but this should not be taken as a rigid requirement that individual employees be considered one at a time, and without regard to each other.[6] This would be contrary to the expedition and flexibility that is the hallmark of the administrative process.

---

6. Can an employer escape all liability for a wrongful termination of, say, 50 employees, merely by showing there was comparable employment for, say, five or six persons in the area during the period, and then arguing that the failure of the employees to seek, find and obtain these positions reflects a lack of diligence that disqualifies all 50?