**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ARDUINI MANUFACTURING CORPORATION, Respondent.**

**No. 7023.**

United States Court of Appeals
First Circuit.

May 7, 1968.

---

Harold B. Shore, Attorney, Washington, D. C., with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Lawrence M. Joseph, Attorney, Washington, D. C., were on brief, for petitioner.

George H. Mason, Worcester, Mass., with whom Richard A. Robinson and Vaughan, Esty, Crotty & Mason, Worcester, Mass., were on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

In this case the National Labor Relations Board petitions for enforcement of its order directing respondent, Arduini Manufacturing Corporation, to pay two discriminatorily discharged employees named Cassanelli and Gibeault certain stated amounts in back pay.[1]

The trial examiner who heard this matter initially found that both employees had failed to exercise reasonable diligence in minimizing loss of income in the period between their discharge and reinstatement and recommended that except for minor sums due them under respondent's profit sharing plan, they be

---

1. As a result of a prior unfair labor practice proceeding, reported at 153 N.L.R.B. 887, respondent was required to reinstate the two discriminatees and to make them whole for any loss of pay caused by their discharge. This is a supplementary proceeding to determine the amount of back pay due.

denied back pay.[2] The Board refused to accept the trial examiner's findings and recommendations. It found that except for a six week period in the case of Cassanelli and a ten week period in the case of Gibeault, both employees had made reasonable efforts to mitigate their loss of income and that respondent did not sustain its burden of proving otherwise. The question for us is whether on the record as a whole (including the trial examiner's findings) the Board's findings are supported by substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 496–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

First, as to Cassanelli, the record shows that in the period between discharge and reinstatement this employee earned some $5577—never less than $650 in any full quarter—as compared with his usual salary at Arduini of $153.90 a week. Since admittedly he spent six weeks doing farm work for himself and others without compensation, this total amount is of considerable significance.

Respondent and indeed the trial examiner have compiled an impressive catalogue of indications that Cassanelli did not do all that he could have done to mitigate his loss of pay. He seems to have gone to the Employment Security Office only to see about unemployment benefits. Also, apparently he did not believe in reading "help wanted" ads in the newspapers. Although skilled in carpentry and related areas, there is no indication that he visited places where construction skills would be expected to be in short

supply. His records were sketchy; his testimony at times implausible and inconsistent.[3]

Although we can understand how these considerations would persuade the trial examiner, we think that the Board in reaching an opposite conclusion as to Cassanelli is supported by substantial evidence. The unsatisfactory character of the record book is not surprising when we consider that Cassanelli was used to working for a wage. For the most part record keeping to him meant collecting W-2 forms. He freely admitted he was a "bad bookkeeper." Generally, however, he seemed cooperative about providing whatever information he could recall or divine from his meager records.[4]

The fact that Cassanelli sometimes worked for wages, at other times was self-employed and at still other times performed work in which his exact status is unclear, presents somewhat of a problem.[5] Respondent argues that while Cassanelli was entitled to make his way either as an employee or a contractor, this hybrid status is out of harmony with a sincere desire to mitigate loss of earnings. If it is meant that this is so per se, we see no reason to agree. But if it is meant that in fact Cassanelli's talk about going into business for himself was little more than a ploy to avoid steady work, this flies in the face of his actual earnings during the period in dispute. Respondent portrays this man as fleeing from job opportunities at every turn, when in fact Cassanelli averaged

2. Both employees were discharged on June 9, 1964, allegedly for stealing company property. Each received two weeks vacation pay. Gibeault obtained full-time employment some five months later (November 23, 1964) and continued to be employed until he returned to work for the respondent on July 18, 1965. The trial examiner did recommend back pay of $216.18 for that period as did the Board. Cassanelli returned to work at Arduini on July 28, 1965.

3. For example, he could not make up his mind whether his record book was written in response to his employment experiences or the impending litigation; nor could he

explain the missing pages in it and its lack of chronological sequence.

4. Nor do we attach great significance to the fact that Cassanelli did not follow the want ads in the newspapers. He was principally seeking work as an independent contractor.

5. Thus Cassanelli observed at the hearing: "Well, I'll say this. I had determined that I would never go to work for anybody else real steady, and I didn't want to go join a union and go into something like that. I wanted to get back on my own feet and see if I could go back into building."

about $116 a week during the period in question—more than 70% of what he had been earning while employed by respondent.

■ It may be that by seeking steady work as an employee or by pursuing his role as an independent contractor more steadfastly, Cassanelli could have reduced his loss of income even more. He is held, however, only to reasonable exertions in this regard, not the highest standard of diligence. N. L. R. B. v. Cashman Auto Co., 223 F.2d 832 (1st Cir. 1955). We think he satisfied this standard here. It may also be that even in the employment framework that Cassanelli chose, reasonable efforts would have resulted in even more income. But the burden of proving this is on respondent. Nabors Co. v. N. L. R. B., 323 F.2d 686, 692–693 (5th Cir. 1963), cert. denied, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964). The record supports the Board's determination that this burden was not met. As the Board observed, most of the trial examiner's findings were relevant only to one who was or should have been looking for ordinary permanent employment, whereas Cassanelli was attempting to establish himself as an independent contractor. Moreover, the trial examiner tended to assume the existence of job opportunities neglected by Cassanelli.[6] However plausible this assumption may be, it is unsupported by the record.[7] Thus we think the Board's findings as to Cassanelli are supported by substantial evidence.

In the case of Gibeault, we are concerned with a relatively short period of time. When discharged he, too, received two weeks vacation pay. Immediately thereafter there was a ten week period during which Gibeault attended to farm work, vacationed and admittedly was unavailable for employment. Since he was employed elsewhere from November 23, 1964, until his reinstatement by respondent,[8] we are concerned only with the period commencing twelve weeks after his discharge and ending with his acceptance of the interim job.

■ We are unable to say that the record as a whole supports the Board's finding that Gibeault showed reasonable diligence in obtaining new employment during the period in question. Although respondent's witnesses testified that there was a shortage of men with Gibeault's skill (grinders) in Worcester, the very city where he had worked for respondent for twelve years, Gibeault never even applied for a job there. His explanation was that he did not know Worcester very well. Moreover, he said he did not read the want ads in the newspapers, explaining that he did not read English.[9]

The circumstances in which Gibeault got an interim job are also revealing. A friend of his, an employee at A-1 Company, had suggested some five or six months earlier that Gibeault come to work for A-1. He declined because although the pay was slightly higher than what he was getting from respondent, there were no fringe benefits. Then in mid-November 1964, apparently around Wednesday, November 18, 1964, Gibeault went to A-1 not to seek employment but to visit his friend. The superintendent happened along and offered Gibeault a

---

6. The trial examiner relied on Cassanelli's own statement: " * * * When I didn't have work up to Marino's house, I would sometimes go back to Polito's, and he would have work for me." It seems to be reading too much into this remark to infer as does the trial examiner that Polito employed Cassanelli entirely at the latter's convenience.

7. Thus, for example, the examiner suggested that Polito, who was a prime source of income to Cassanelli during the period in question, would have been willing to employ him even longer than he did. Yet Polito was not called to testify and no one else said anything to indicate that this was true.

8. For one week during this period he was out of work for medical reasons.

9. When asked why his wife did not do this for him he said that her work hours —5 P.M. to 11 P.M.—did not permit this. When asked whether there was perhaps someone else who could read the want ads for him, he said there was not.

job, starting the next day. After some discussion he accepted but said that he would begin the following Monday. He explained that he did not like to have a half pay. Questioned as to why he did not apply to A-1 sooner, he said that he didn't think of it.

This is all very extraordinary for a number of reasons. Here is a man out of work for several months. He knows of a company employing men doing the same work that he supposedly is seeking. The company is on his mind to the extent that he visited a friend there. A few months before this friend had told him the company would be willing to give him a job. Yet far from going there earlier to get a job, it turns out that he was not even looking for one when he did go there. Thereafter, having stumbled into a job through no fault of his own, he delays his beginning date several days because he does not like "a half pay." Unless we are to assume that Gibeault was actuated by an unusually acute sense of symmetry, we cannot but conclude that he was not too anxious to get off the unemployment rolls.[10]

█ The Board attaches much significance to the fact that although Gibeault did not actually seek work in Worcester, he registered with the unemployment office in Southbridge. Apart from the fact that the record is ambiguous as to what extent the Southbridge unemployment office passed on information about job opportunities in Worcester, in our opinion reasonable diligence is not satisfied by this alone, at least in the circumstances of this case. Except for the trips to the Employment Security Office, three visits to one local company and one visit to another, Gibeault appears to have made no real effort to gain employment during the period in question in this case. From our examination of the record as a whole, we cannot say that with reference to Gibeault the Board's findings are supported by substantial evidence.

A decree may be entered enforcing that part of the Board's order awarding back pay and profit sharing credits to employee Cassanelli. The Board's order with reference to employee Gibeault shall be set aside and that portion of the case will be remanded to the Board with directions to enter an order awarding back pay and profit sharing credits to employee Gibeault in accordance with the findings and recommendations of the trial examiner; no costs in this court.

---

10. The record shows that Gibeault was receiving $67 a week as unemployment compensation at the time he took this job.