NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MERCY PENINSULA AMBULANCE SERVICE, INC., Respondent.

No. 78–1010.

United States Court of Appeals, Ninth Circuit.

Jan. 18, 1979.

Ellen Spangler (argued), Washington, D. C., for petitioner.

Harold W. Martin (argued), San Mateo, Cal., for respondent.

Before DUNIWAY and CHOY, Circuit Judges, and POOLE *, District Judge.

CHOY, Circuit Judge:

The National Labor Relations Board (NLRB or the Board), pursuant to Section 10(e) of the National Labor Relations Act (NLRA or the Act), 29 U.S.C. §§ 151–169, and 29 C.F.R. § 102.52, applies to this court for enforcement of a supplemental order issued against Mercy Peninsula Ambulance Service, Inc. (Mercy). The supplemental order provided, in accordance with the Board's previous finding that Mercy had violated § 8(a)(3) & (1) of the Act,[1] that discriminatee Douglas Castle was entitled to receive backpay from Mercy in the amount of $7,659.56 plus interest at 7% per annum.[2] We deny enforcement of the Board's supplemental order.

I. *Statement of the Case*

Douglas Castle was employed by Mercy from October of 1973 to June 19, 1974. While in Mercy's employ, Castle prepared

and circulated a petition that listed pay grievances against Mercy and which ultimately was sent to the Employment Standards Administration of the Department of Labor. Castle's activities were discovered by Mercy's president and others. Castle was subsequently discharged. After his discharge, Castle filed charges against Mercy, claiming that Mercy had committed multiple violations of the Act in discharging him.

The Board issued a decision, after a hearing before an Administrative Law Judge (ALJ), that Castle's discharge was discriminatory[3] and ordered that Mercy immediately reinstate Castle and compensate him for the loss of earnings he suffered as a result of his discharge. The issue of the amount of backpay due Castle was reserved for a subsequent hearing. In anticipation of this backpay hearing, Mercy and the NLRB agreed that "[i]n the event judicial proceedings are . . . necessary to enforce or to review the Board's backpay determination, the only issue before the court will be the validity of the backpay computation."

A supplemental backpay proceeding was instituted and the presiding ALJ found "that Castle did not make a reasonable and diligent effort to find work during the period from the date of his discharge to November 15, 1974." He found that Castle was, therefore, not entitled to backpay for that period. Although expressing doubt as to Castle's diligence in mitigating his loss of income from November 15, 1974 to March 31, 1975,[4] the ALJ concluded that Mercy had failed to prove that Castle had not made "reasonable and diligent efforts to find employment" and that Castle was thus

---

* The Honorable Cecil F. Poole, United States District Judge for the Northern District of California, sitting by designation.

1. The Board's decision finding that Mercy violated § 8(a)(3) and (1) is reported at 217 N.L.R.B. 829 (1975).

2. The Board's supplemental decision and order is reported at 232 N.L.R.B. No. 149.

3. Mercy's requirement that employees sign a statement declaring their allegiance to union membership immediately upon accepting em-

ployment was held violative of section 8(a)(2) and (1), 29 U.S.C. § 158(a)(2) & (1), while its discharge of Castle for engaging in protected union and nonunion activities was found to be a violation of section 8(a)(3) and (1), 29 U.S.C. § 158(a)(3) & (1).

4. The backpay period under consideration terminated on March 31, 1975, the date upon which Castle enrolled in a full time paramedic course, removing himself from the labor market completely.

entitled to backpay for that period. Castle was awarded $3,537.17 with interest at 6% per annum.

On December 30, 1976, the backpay order issued by the ALJ was reviewed by the NLRB. The Board was in agreement with the ALJ's determination that Castle was entitled to backpay for the period November 16, 1974 to March 31, 1975. However, the Board found that the ALJ erred in rejecting Castle's claim for backpay from June 19, 1974 to November 15, 1974. Contrary to the ALJ's findings, the Board concluded that the evidence presented indicated "Castle's persistent efforts to obtain employment from the date of his discharge through November 15." This persistence, the Board found, "clearly manifest[ed] appropriate diligence to mitigate [Mercy's] financial loss" and that Mercy had not sustained its burden of proving that Castle incurred a wilful loss of earnings. The Board ordered Mercy to pay Castle $7,659.56 net backpay with interest at 7% per annum. The Board now seeks enforcement of its supplemental decision and order.[5]

## II. *Mercy's Backpay Liability*

Mercy urges that the supplemental order not be enforced, contending that the Board's determination that Castle exercised reasonable efforts to secure employment for the nine month period following his discharge and that he is entitled to backpay for that period is in error.

Section 10(c) of the NLRA, 29 U.S.C. § 160(c), authorizes the NLRB to require that an employer guilty of unfair labor practices desist from such practices and "take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]." The Supreme Court has stated that the Board's arsenal of reinstatement and backpay

is remedial, not punitive, and is to be exercised in aid·of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act. *Local 60 v. NLRB*, 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see NLRB v. Seven-Up Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197–98, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); Daylin, "Back Pay Under the National Labor Relations Act," 39 Iowa L.Rev. 104, 104 (1958). A worker who has been the victim of an unfair labor practice is not entitled to simply await reimbursement from his or her employer for wages lost, for "the statute was not intended to encourage idleness." Daylin at 117; *see NLRB v. Seven-Up Co.*, 344 U.S. at 346, 73 S.Ct. 287; *Phelps Dodge Corp. v. NLRB*, 313 U.S. at 200, 61 S.Ct. 845. To hold otherwise would undermine the "healthy policy" underlying the Act, "promoting production and employment." *Phelps Dodge Corp. v. NLRB*, 313 U.S. at 200, 61 S.Ct. 845. Where the backpay award does not effectuate the policies of the Act, it should not be enforced. *See NLRB v. Dodson's Market, Inc.*, 553 F.2d 617, 620 (9th Cir. 1977).

Consistent with the policies of the Act, the rule is that once the general counsel of the Board has established the amount of backpay due the discharged employee, the burden is upon the employer to produce evidence to mitigate its liability. *Id.* at 619; *NLRB v. United Brotherhood of Carpenters & Joiners*, 531 F.2d 424, 426 (9th Cir. 1976). Mitigation will result not only where the worker has taken in earnings from another source after discharge, but also for "losses willfully incurred"—such as when the discriminatee fails to secure comparable employment without excuse. *Phelps Dodge*

---

5. Under 29 U.S.C. § 160(e), "[t]he. Board shall have power to petition any court of appeals of the United States, . . . within any circuit . . . wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order." The violations here occurred in California, which is within the Ninth Circuit. Thus, this court has jurisdiction over the Board's petition.

Corp. v. NLRB, 313 U.S. at 197–98, 61 S.Ct. 845. A discharged worker is not held to the highest standard of diligence in his or her efforts to secure comparable employment; "reasonable" exertions are sufficient. *See Heinrich Motors, Inc. v. NLRB,* 403 F.2d 145, 149 (2nd Cir. 1968); *NLRB v. Arduini Manufacturing Corp.,* 394 F.2d 420, 423 (1st Cir. 1968); *NLRB v. Miami Coca-Cola Bottling Co.,* 360 F.2d 569, 575 (5th Cir. 1966); *NLRB v. Brown & Root, Inc.,* 311 F.2d 447, 452 (8th Cir. 1963).

■ The issue we must now decide is whether the evidence supports the Board's finding that discriminatee Castle in fact discharged the duty incumbent upon him to exercise "reasonable diligence" in seeking comparable employment. The appropriate standard of review dictates that, to the extent the Board's decision rests on findings of fact for which there is "substantial evidence" on the record as a whole, this court must defer to that decision. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Tomco Communications, Inc.,* 567 F.2d 871, 876 (9th Cir. 1978). On numerous occasions the courts have attempted to articulate the nebulous ingredients of the "substantial evidence" standard. The Supreme Court has stated that "substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB,* 305 U.S. at 229, 59 S.Ct. at 217; *see NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 299–300, 59 S.Ct. 501, 83 L.Ed. 660 (1939) (imposing a directed verdict standard).

Upon review, the record reveals that Castle made attempts at securing employment an average of only three times a month during each of the nine months that he was in the job market after his discharge.[6] We do not believe that it is reasonable to con-

---

6. Viewing the record as a whole, as we are bound to do we extract the following testimony and evidence in summary of Castle's job search efforts:

*June, 1974:* Castle called two ambulance companies. He was told that no positions were available and that he could submit, in person, an application at his convenience. He did not, however, do this until some three months later.

*July, 1974:* He contacted two ambulance companies and one fire department, each of which indicated that there were no openings. This was the extent of Castle's efforts for the month of July.

*August, 1974:* He called on three fire departments within a span of two days and left some sort of application at two of them.

*September, 1974:* Castle visited three of the ambulance companies which he had previously contacted and which had previously informed him that there were no openings for purposes of submitting application. He admitted that during the month of September, job search efforts took about one and a half hours of his time.

*October, 1974:* Within the first two weeks of October he contacted three fire departments and then made no further efforts for the remainder of the month.

*November, 1974:* He contacted one hospital and submitted an application to another hospital. He claims that during the balance of the month he spent his time trying to develop a position as a news reporter for an emergency medical care committee newsletter, to be sponsored by a charitable organization.

*December, 1974:* Castle spent the first two weeks of December working out proposals for the newsletter. He also made inquiry of a friend about employment and filed an application with a health services employment agency.

*January, 1975:* He proceeded to make contact with three different businesses, attempting to find employment outside of his trade of ambulance driving. None of these three businesses was hiring, however.

*February, 1975:* His attempts to secure employment during the month of February consisted solely of three phone calls to different businesses, none of which was hiring.

*March, 1975:* After being rejected once again by two of the same businesses mentioned above, Castle finally pulled himself out of the job market by enrolling in a paramedic course at Stanford University.

Beginning at the end of June, 1974, Castle registered with the California State Employment office and reported back every two weeks throughout the backpay period. Beginning toward the end of August when he won an unemployment appeals decision, he collected an unemployment insurance check each time he visited the agency. All that he did was to get in line, where a clerk would process his check and, if any interviews were available, would let him know what he had to do. Castle described it as "a formal process."

Additional evidence revealed that from approximately one month prior to his discharge, until well into November, 1974, a substantial amount of Castle's time and effort was spent promoting an ambulance driver's association.

clude that so few attempts constitute "reasonable diligence." *See NLRB v. Arduini Manufacturing Corp.,* 394 F.2d at 424 (discriminatee not reasonably diligent where he did not apply to company that he knew was hiring in his field of work, visited only four companies in search of employment and merely registered with the Employment Security Office); *NLRB v. Armstrong Tire & Rubber Co.,* 263 F.2d 680, 683 (5th Cir. 1959) (discriminatee not reasonably diligent where he devoted full time efforts for six months to his wife's business and thereafter made infrequent attempts to secure employment elsewhere).[7] To hold otherwise would run contrary to the purposes of the backpay remedy, encourage idleness and reward slothfulness.

■ We conclude that the Board's finding that Castle was reasonably diligent in seeking employment after his discriminatory discharge is not supported by substantial evidence[8] and that Mercy has adequately met its burden of proving that Castle breached his duty of mitigating his loss.[9]

ENFORCEMENT DENIED.

The evidence pointing to these extra-employment activities consisted of the credited testimony of several witnesses and a letter Castle wrote to the Emergency Medical Care Committee in which he described his discharge and the activities he undertook thereafter, stating:

When I was first fired it would have been easy for me to walk away and merely get a better job for myself. But I felt an obligation to improve my fellow worker's lot.

The ALJ and the Board arrived at opposite interpretations of this writing and of the evidence in general. However, given the quantity and the quality of Castle's efforts and the fact that they were executed with such disinterest, we believe that neither the ALJ nor the Board correctly applied the standard of "reasonableness" to which a discriminatee must be held with respect to his or her mitigation duty.

7. *Cf. Golay & Co. v. NLRB,* 447 F.2d 290, 295 (7th Cir. 1971) (discriminatees in their fifties, lacking a high school education, who applied at various businesses and finally did obtain jobs held to have been diligent in their search for employment); *Heinrich Motors, Inc. v. NLRB,* 403 F.2d 145, 147–48 (2nd Cir. 1968) (where discriminatee engaged in self employment without profit, reasonable diligence in discharging mitigation duty was found nevertheless).

8. In deciding that the Board's decision is not supported by "substantial evidence," we do not substitute our judgment for that of the Board on matters about which reasonable minds may disagree. The question here at issue is one of both law and fact. This court has recognized: "Where the issues are not purely factual, the Act does not explicitly direct courts to exercise a particular measure of review. Manifestly, however, the measure of our oversight increases as the Board's determination approaches the purely legal." *NLRB v. Tomco Communications, Inc.,* 567 F.2d 871, 876 n.2 (9th Cir. 1978).

9. Because we deny enforcement of the Board's supplemental order, we need not reach Respondent Mercy's remaining contentions that the Board abused its discretion by denying enforcement of a subpoena issued by Mercy and that it received an unfair hearing.