No. 84-38

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

IN THE MATTER OF UNFAIR LABOR
PRACTICE:

CITY OF GREAT FALLS, MONTANA,

Defendant/Petitioner and Appellant,

-vs-

BRUCE YOUNG BY CONSTRUCTION AND
GENERAL LABORERS' LOCAL NO. 1334
AFL-CIO,

Complainant and Respondent,

and

MONTANA BOARD OF PERSONNEL APPEALS,

Intervenor.

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable H. William Coder, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

David V. Gliko, City Attorney, Great Falls, Montana

For Respondent:

D. Patrick McKittrick, Great Falls, Montana

For Intervenor:

James E. Gardner, Board of Personnel Appeals, Helena,
Montana

Submitted on Briefs: March 30, 1984

Decided: June 19, 1984

Filed: June 19, 1984

Ethel M. Harrison
Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

The City of Great Falls (City) appeals from an order of the District Court of the Eighth Judicial District, Cascade County, affirming an order of the Board of Personnel Appeals (Board) awarding backpay and restoring certain contractual benefits to complainant Bruce Young on account of an unfair labor practice committed against Young by the City. We affirm.

This is the third instance in which this Court has been petitioned to resolve matters arising out of a labor dispute between the City and Young and his union. In Young v. City of Great Falls (Mont. 1981), 632 P.2d 1111, 38 St.Rep. 1317 (Young I), this Court addressed the propriety of joining the Board as a necessary party to any judicial review in District Court of a Board order. A year later, in Young v. City of Great Falls (Mont. 1982), 646 P.2d 512, 39 St.Rep. 1047 (Young II), this Court affirmed a judgment by the District Court affirming a Board decision that the City had committed an unfair labor practice in its dealings with Young. Subsequent to that appeal, on September 30, 1982, a hearings examiner for the Board conducted a hearing for the purpose of designing an appropriate remedial order. The examiner's recommended order, dated January 7, 1983, was appealed by the City to the Board. The Board adopted the order without alteration on March 9, 1983. The City appealed this decision to the District Court, but the court affirmed. The City's challenge to the remedial order is now before this Court.

The remedial order fashioned by the examiner and

-2-

affirmed by the Board and the District Court has three essential components: (1) that the City tender to Young back pay in the amount of $9,633.66 (less amounts deducted by state and federal agencies for contribution to Social Security, Public Employees' Retirement, and other similar obligations) plus interest of $4,628.09, for the time period October 31, 1978 to July 20, 1979; (2) that the City restore to Young all seniority and longevity rights due him under the collective bargaining agreement between the City and Young's union; (3) that the City credit Young with other benefits due him under the agreement.

The City contests the findings in support of the back pay component and the specific terms of the component. During and since the September 30, 1982, hearing, the City has resisted any award of back pay on the ground that Young failed to mitigate his financial losses by exercising reasonable diligence to obtain interim employment. Assuming that Young is entitled to back pay, the City has challenged the time period for which the award is to be calculated and the method used by the Board to calculate both the amount of back pay and interest due on that amount.

On appeal, the City raises the following issues:

(1) Whether there is substantial evidence to support the Board finding that Young exercised "reasonable diligence" in obtaining interim employment during the period in which he was laid off by the City?

(2) Whether the remedial period adopted by the hearing examiner and affirmed by the Board is proper?

(3) Whether the Woolworth formula used to calculate the amount of back pay owed Young is appropriate for this

case?

(3) Whether the Florida Steel formula used to calculate the amount of interest awarded on back pay is appropriate in light of Montana law respecting interest on judgments?

Our analysis of these issues is guided by reference to National Labor Relations Board (NLRB) decisions and federal judicial interpretation of the National Labor Relations Act (NLRA). Because of the similarity between the NLRA and the Montana Public Employees' Collective Bargaining Act, (PECBA) Sections 39-31-101 to -409, MCA, we have found federal administrative and judicial construction of the NLRA instructive and often persuasive regarding the meaning of our own labor relations law. See, e.g., Teamsters Local #45 v. State ex rel. Bd. of Personnel Appeals (Mont. 1981), 635 P.2d 1310, 1312, 38 St.Rep. 1841, 1844; State ex rel. Bd. of Personnel Appeals v. District Court (1979), 183 Mont. 223, 225, 598 P.2d 1117, 1118.

## THE ISSUE OF "REASONABLE DILIGENCE"

Following federal precedent, all of the parties agree that back pay is not always an appropriate remedy for an aggrieved employee:

> "A worker who has been the victim of an unfair labor practice is not entitled to simply await reimbursement from his or her employer for wages lost, for 'the [law] was not intended to encourage idleness.' [citations omitted].
>
> ". . .
>
> "'Mitigation [of an employer's liability for backpay] will result not only where the worker has taken in earnings from another source after discharge, but also for 'losses willfully incurred'-- such as

-4-

> when the discriminatee fails to secure
> comparable employment without excuse.
> [citations omitted] A discharged worker
> is not held to the highest standard of
> diligence in his or her efforts to secure
> comparable employment; 'reasonable'
> exertions are sufficient. [citations
> omitted]." N.L.R.B. v. Mercy Peninsula
> Ambulance Serv. (9th Cir. 1979), 589 F.2d
> 1014, 1017-18.

See also McCann Steel Co. v. N.L.R.B. (6th Cir. 1978), 570 F.2d 652, 656; N.L.R.B. v. Arduini Mfg. Corp. (1st Cir. 1968), 394 F.2d 420, 423; N.L.R.B. v. Armstrong Tire and Rubber Co. (5th Cir. 1959), 263 F.2d 680, 683; Airport Service Lines (1977), 231 N.L.R.B. 137, 96 L.R.R.M. (BNA) 1358.

The City maintains that Young did not exercise "reasonable diligence" in seeking interim employment. According to the City, the record demonstrates that Young made minimal efforts to secure other employment between October 31, 1978, the day he was laid off, and July 20, 1979, the day he was reinstated. The City likens Young's efforts to those of the aggrieved employee in Mercy Penninsula, supra. In that case, back pay was denied to the victim of an unfair labor practice upon a finding that he made but a few, insincere attempts during his nine months of unemployment to seek other work. 589 F.2d at 1018. See also Alfred M. Lewis, Inc. v. N.L.R.B. (9th Cir. 1982), 681 F.2d 1154, 1156 (explaining facts of Mercy Peninsula); Arduini, supra (court found lack of reasonable diligence where discriminatee did not apply for job with company he knew was hiring and where he visited only four other companies and registered with employment office).

Our review is confined to the question of whether there is substantial evidence to support the finding of the

Board that Young had exercised reasonable diligence. See section 2-4-704(2)(e), MCA; Slater v. Emp. Sec. Div. (Mont. 1984), 676 P.2d 220, 222, 41 St.Rep. 247, 249-50.

The record indicates that, following his termination, Young made weekly contacts with the union hall and with the local Job Service regarding prospective employment. Through the union, Young obtained a job of one-week's duration with a local construction company. Upon obtaining this job, Young's name was placed at the bottom of the union hall's hiring list, and, consequently, was unable to obtain additional work through the union in part because of his low position on the list. However, he was able to secure, through his own initiative, another week's worth of work with a construction firm in Shelby, Montana, approximately eighty miles from Great Falls. Young also contacted several other individuals and companies about job prospects, but could not remember all of their names or the specific number of individuals and companies approached. There was evidence that job opportunities were hampered by winter weather conditions and a slow economy.

The hearing examiner found that Young's efforts amounted to reasonable diligence, considering all the attendant circumstances. The Board concurred, and we find no reason to disturb this finding. Once the Board has established the amount of back pay owed an otherwise wrongfully discharged employee, the burden is upon the employer to produce evidence to mitigate its liability. Mercy Peninsula, supra, at 1017 (citing cases). Here, the evidence of Young's job-hunting efforts and the detrimental effect of weather and economic conditions on the job market

were uncontraverted. Furthermore, the facts of this case are clearly distinguishable from those in Mercy Peninsula and Arduini. The City has not demonstrated how the available evidence can reasonably be interpreted as indicative of indifference, insincerity or slothfulness on Young's part in his search for employment.

THE ISSUE OF THE REMEDIAL PERIOD

The period for calculating back pay typically begins to run at the time of the illegal discharge and ends when the aggrieved employee's reinstatement becomes effective. Bob Maddox Plymouth, Inc. (1981), 256 N.L.R.B. 813, 107 L.R.R.M. (BNA) 1325. However, this remedial period can be reduced if there is proof of mitigating circumstances. The burden of proof is on the employer to establish that it would not have had work available for an illegally discharged employee due to economic or other factors. N.L.R.B. v. Midwest Hanger Co. (8th Cir. 1977), 550 F.2d 1101, 1104-1105, cert. den. 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 90; N.L.R.B. v. Maestro Plastics Corp. (2d Cir. 1965), 354 F.2d 170, 176, cert. den. (1966), 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682.

The hearing examiner found, and the Board concurred, that the appropriate remedial period for Young extended from October 31, 1978, the day of his termination, to July 20, 1979, the day of his reinstatement. The City maintains that the relevant period should end January 5, 1979, because Harold Spilde, the employee who had been wrongfully retained after October 31, had been laid off on January 5, with no hiring taking place until Young was reinstated July 20.

-7-

Because of "budget constraints" in effect at the time immediately following Spilde's termination, the City reasons that there would have been no work for Young to perform.

The essence of the City's argument was presented to this Court in Young II and rejected as contrary to the available evidence:

> "In addition to Spilde, CETA [Comprehensive Employment and Training Act] employees with less seniority than Young continued to do laborer's work after Young's discharge [on October 31, 1978]. Furthermore, 7 or 8 new employees were hired by the [City] Street Department in April 1979, but not Young. It was in this period that [Bob] Duty, [Superintendent of the Department,] said in effect, 'I don't care what happens. I won't hire Bruce Young back in the Street Department.'" 646 P.2d at 514, 39 St.Rep. at 1049.

We find no evidence to dispute our original finding. Indeed, as the hearing examiner noted in his recommended remedial order, there is evidence that the City had laborer's work available after January 5, 1979. Moreover, it appears that the CETA employees used to perform this work may have been used illegally, because CETA jobs may not result in displacement of regular employees and may not impair existing labor contracts. 41 Fed.Reg. No. 124 (1981) (since repealed). Had Young not been wrongfully discharged, he would have had standing to challenge any subsequent substitution of CETA workers for regular union contract employees after January 5, 1979. Finally, we note that the City did not offer evidence at the hearing about any budget constraints. In short, we find no reason to alter the prescribed remedial period.


THE APPROPRIATENESS OF THE WOOLWORTH FORMULA

In calculating the amount of back pay due an illegally discharged employee, the Board utilizes a method first developed and used by the N.L.R.B. in F.W. Woolworth Co. (1950), 90 N.L.R.B. 289, 26 L.R.R.M. (BNA) 1185. This method, commonly referred to as the "Woolworth" formula, has been approved by the United States Supreme Court. N.L.R.B. v. Seven-Up Bottling Co. (1953), 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377.

Under this formula, the N.L.R.B. and the Board compute back pay "on the basis of each separate calendar quarter or portion thereof" from the time of the illegal discharge to the time of a proper offer of reinstatement. The quarters begin with the first day of January, April, July and October. See Woolworth, 90 N.L.R.B. at 293, 26 L.R.R.M. at 1185-86. See also 8 F.R.E.S. Section 63:74 (1978). In the instant case, Young's back pay was calculated for four quarters or portions thereof as follows:

| QTR. ENDING | COMPENSABLE HOURS | RATE PER HOUR | GROSS PAY |
|---|---|---|---|
| 12-31-78 | 344 | $6.675 | $2,296.20 |
| 03-31-79 | 520 | $6.675 | $3,471.00 |
| 06-30-79 | 520 | $6.675 | $3,471.00 |
| 09-30-79 | 112 | $7.055 | $790.16 |
| | | | $10, 028.36 |

Gross pay for the first two quarters listed above was then reduced by $194.70 and $200, respectively, to reflect Young's earnings from the two brief jobs with construction firms. Thus, his total back pay is $9,633.66 for the four quarters, subject to further reductions for contributions to Social Security, PERS, and other obligations.

Prior to using the ~~Woolwoth~~ _Woolworth_ formula, the N.L.R.B. typically computed back pay by subtracting the total amount

earned in other employment from the earnings the employee would have made had he or she not been terminated. This straight subtraction method was ultimately rejected because many employees could conceivably find work that paid more during the duration of their absence from the first job than what they would have earned had they still been employed in that position. "This," according to the N.L.R.B., "resulted in the progressive reduction or complete liquidation of backpay due." 90 N.L.R.B. at 292, 26 L.R.R.M. at 1185. Consequently, the N.L.R.B. concluded that some employers might knowingly delay offers of reinstatement in order to reduce their back pay liability. Aggrieved employees would counter by waiving the right to reinstatement and thus toll the running of back pay to preserve any amounts then owing. 90 N.L.R.B at 292, 26 L.R.R.M. at 1185.

To maintain the effectiveness of reinstatement policies and restore industrial peace, the quarterly method of computation or "Woolworth formula" was adopted. Under this approach:

> "[t]he liability for each quarter may be determined by reference to factors then current, and not subject to subsequent fluctuation. Thus, both employee and employer will be in a position to know with some precision the amount that will be due at the end of each 3-month period, if discrimination should ultimately be found." 90 N.L.R.B. at 293, 26 L.R.R.M. at 1186.

This formula also protects an employee's right to Social Security benefits, which are based on the number of quarterly contributions from wages. Thus, the formula serves the remedial purposes of labor law and retirement law. 90 N.L.R.B. at 293, 26 L.R.R.M. at 1186.

We emphasize that this method has been approved by the

United States Supreme Court as a proper exercise of informed discretion. Seven-up Bottling, supra, 344 U.S. at 346-48, 73 S.Ct. at 288-89, 97 L.Ed. at 381-83. The only caveat expressed by the Court was that the N.L.R.B. could not "apply a remedy it has worked out on the basis of its experience, without regard to circumstances which may make its application to a particular situation oppressive and therefore not calculated to effectuate a policy of the [National Labor Relations] Act." 344 U.S. at 349, 73 S.Ct. at 290, 97 L.Ed. at 383.

The City objects to the use of the Woolworth formula in the immediate case, primarily because Young allegedly did not exercise reasonable diligence in obtaining interim employment during the quarterly periods that he would have been working for the City. This is not so much a criticism of the formula for calculating back pay as it is a reiteration of the already rejected argument that Young did not exercise reasonable diligence in seeking interim employment.

Nevertheless, the City makes an additional argument, i.e., that Woolworth is somehow inapplicable to public sector employment. We disagree. The City's arguments here are presented in the form of conclusions as opposed to reasoned arguments. The Woolworth formula has been applied in other states to public sector unfair labor practices. See e.g., Golden Cab. Co., 1 Nat'l Pub. Empl. Rep. (Lab. Rel. Press) 438 (Pa.Lab. Rel. Bd. Nov. 1, 1979). The City has offered no reasons why the formula works in an "oppresive" manner contrary to the goals of the Montana Public Employees' Collective Bargaining Act. See Seven-Up

-11-

Bottling, supra, 344 U.S. at 349, 73 S.Ct. at 290, 97 L.Ed at 383. Moreover, we note that the alternative formula proposed by the City, which is based on a method used in a sex discrimination case, E.E.O.C. v. Ford Motor Co. (4th Cir. 1981), 645 F.2d 183, rev'd on other grounds (1982), 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721, would, if applied to this case, result in the same amount of back pay due Young. The Board did not act erroneously by applying Woolworth to this case.

## THE APPROPRIATENESS OF THE FLORIDA STEEL FORMULA FOR CALCULATING INTEREST ON BACKPAY

In addition to awarding Young back pay, the Board granted interest on that award, using a formula first used by the N.L.R.B. in Florida Steel Corp. (1977), 231 N.L.R.B. 651, 96 L.R.R.M. (BNA) 1070. This formula establishes a variable rate of interest, taken from Internal Revenue Service methods of interest calculation. The Florida Steel formula replaces a fixed six percent interest standard first applied in Isis Plumbing and Heating Co. (1962), 138 N.L.R.B. 716, 51 L.R.R.M. (BNA) 112 and accepted as reasonable by the federal courts. See, e.g., N.L.R.B. v. Int'l Union of Operating Engineers (6th Cir. 1967), 380 F.2d 244. The reasons for rejecting a fixed interest rate in favor of a variable rate are clearly set forth in Florida Steel:

> "Taking into consideration [inflationary trends and the remedial purposes of the NLRA,] . . . the flat 6-percent interest rate no longer effectuates the policies of the [NLRA]. A rate of interest more accurately keyed to the private sector money market would have the effect of encouraging timely compliance with

> [N.L.R.B.] orders, discouraging the
> commission of unfair labor practices, and
> more fully compensating discriminatees
> for their economic losses." 231 N.L.R.B.
> at 651, 96 L.R.R.M. at 1072.

These views were recently reaffirmed in Olympic Medical
Corp. (1980), 250 N.L.R.B. 146, 104 L.R.R.M. (BNA) 1325.
The Montana Board of Personnel Appeals finds these same
considerations relevant to remedying unfair labor practices
in Montana.

The City objects to the interest award of $4,628.09 on
grounds that the variable rates used by the hearing examiner
and the Board exceed the statutory limitation on interest on
judgments, and because the interest was compounded. Section
29-9-205(1), MCA, provides that, except in cases where the
interest to be recovered on a judgment is specified in a
contract, interest is payable "at a rate of 10% per annum
and no greater rate [,and] . . . must not be compounded in
any manner or form." Furthermore, the City maintains that
the rate on judgments should be the six percent rate used in
Int'l Union of Operating Engineers, supra.

There is no question that the variable rate formula
used by the hearing examiner and approved by the Board
results in an effective interest rate exceeding ten percent.
The following calculations are taken from the hearing
examiner's recommended order as affirmed by the Board:

| QUARTER ENDING | NET BACK PAY | INTEREST RATE | INTEREST DUE 1-1-83 |
|---|---|---|---|
| 12-31-78 | $2,101.50 | 50.0% | $1,050.75 |
| 3-31-79 | $3,271.00 | 48.5% | $1,586.44 |
| 6-30-79 | $3,471.00 | 47.0% | $1,631.37 |
| 9-30-79 | $790.16 | 45.5% | $359.53 |
| | $9,633.66 | | $4,628.09 |

The choice of interest rates and method of calculation was

explained by the hearing examiner in his recommeded order:

> "The NLRB Regional Office in Seattle reported the following adjusted prime interest rates which it used in calculating back pay award interest in the private sector: 1979-6%; 1980-12%; 1981-12%; 1982-20%. To determine simple interest due, the NLRB totals the rates for the years in which the interest was due and owing then applies that rate (6% + 12% + 12% + 20% in this case) to the amount the employee would have earned, minus interim earnings, as of the end of the first quarter he was terminated. To arrive at interest due in subsequent quarters the first rate (50% here) is reduced by one fourth of the amount of the adjusted prime rate in effect at the time (6% x 1/4 = 1.5% here)."

In response to the City's argument, we note initially that the interest rate was not compounded. The adding of interest for each quarter is merely a shorthand method of calculation. Thus, assuming that section 25-9-205(1) controls, the calculations are not in violation of the prohibition against compounding. However, we are not convinced that the statute prevents the use of variable rates when calculating interest due on back pay awards.

Several states impose statutory restrictions on the amount of interest that may be awarded on court judgments. See e.g., Fla. Stat. Ann. sec. 55.03(1) (West Supp. 1984) (12 percent); Or. Rev. Stat. sec. 82.010(3) (1983) (9 percent). These states in particular have public employee labor relations laws similar to Montana's. We note that, in awarding back pay and interest thereon, personnel appeal boards in those states have limited interest awards to the statutory maximum rate. Hialeah Housing Authority, 4 Nat'l Pub. Empl. Rep. (Lab. Rel. Press) 777 (Fla Pub. Empl. Rel. Comm'n Nov. 12, 1981); Coos County 3 Nat'l Pub. Empl. Rep (Lab. Rel. Press) 589 (Or. Empl. Rel. Bd. Oct. 3, 1980).

From our survey of other jurisdictions, it appears that the Florida and Oregon precedents may be followed elsewhere. Unfortunately, there are no judicial opinions on the correctness of these administrative decisions.

Taking into consideration the justification for awarding interest on any monetary judgment and the remedial purposes of the Montana Public Employees' Collective Bargaining Act, we conclude that the Florida Steel method for calculating interest is lawful. Section 39-31-406(4), which gives the Board authority to award back pay and related remedies, is identical to 29 U.S.C. sec. 160(c)(1976), which the N.L.R.B. relies upon to award back pay and interest in federal labor relations cases. While both section 25-9-205 and the above-cited labor law statutes contemplate that interest on awards or judgments recognizes the debtor-creditor relationship between parties to an action, labor relations law employs interest for more than compensation for the loss of use of the employee's money. The award of interest encourages more prompt compliance with Board orders and discourages the commission of unfair labor practices, thereby effectuating the legitimate ends of labor legislation. See Florida Steel, 231 N.L.R.B. at 651, 96 L.R.R.M. at 1071, 1072; Isis Plumbing and Heating, 138 N.L.R.B. at 719, 720, 51 L.R.R.M. at 1124, 1125.

Thus, the statutory provision on interest must not supplant, but should complement, the legitimate ends of public policy. Here, section 25-9-205(1) does apply to the extent that Young is entitled to ten percent per annum on the judgment, which includes the award of back pay and interest as calculated by the Board, after the district

court affirmance of the Board order. Section 25-9-205(1) does not, however, prevent the use of the Florida Steel formula at the administrative stage of these proceedings.

One final argument of the City must be addressed. In its reply brief, the City reiterates its initial argument that, following N.L.R.B. precedent, the Board should be limited to awards of six percent based on federal appellate court decisions. The City argues that N.L.R.B. decisions like Florida Steel, rendered subsequent to these court holdings, cannot, as administrative rulings, overrule federal court precedents. This argument misapprehends the role of judicial review of these administrative rulings. Federal court decisions that affirm N.L.R.B. rulings do so because the rulings are based on substantial evidence and are in accord with the N.L.R.B.'s statutory mandate. Should the N.L.R.B. determine at some future time that, in view of changing factual conditions, a new ruling or policy should be implemented, that policy will be measured on judicial review by the same or similar principles of substantial evidence and statutory compliance that were employed in previous judicial decisions, not by whether the new ruling is in accord with the previous court decisions. See, e.g., North Cambria Fuel Co. v. N.L.R.B. (3d Cir. 1981), 645 F.2d 177, cert den. 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 110, where the court upheld an N.L.R.B. interest-on-back pay award using a twelve percent rate on grounds that it was within the N.L.R.B.'s statutory discretion to implement. We will adhere to the same principles when evaluating appeals of future Board decisions.

The decision of the District Court affirming the order of the Board of Personnel Appeals is affirmed.

_____
Justice

We concur:

_____
_____
_____
_____
Justices